FILED
UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

Pro Se 5 (Rev. 12/16) Complaint for a Civil Case Alleging Negligence

# UNITED STATES DISTRICT COURT

AUG 2 0 2019

for the

Second District of New Mexico

MITCHELL R. ELFERS
CLERK lmn

2nd Judicial Division

| | | |
|---|---|---|
| Wilfred Alexander Page Et Al<br>CNMTC Patients | ) | Case No. |
| | ) | (to be filled in by the Clerk's Office) |
| Plaintiff(s) | ) | |
| (Write the full name of each plaintiff who is filing this complaint. If the names of all the plaintiffs cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.) | )<br>)<br>)<br>) | Jury Trial: (check one)  ☑ Yes  ☐ No |
| -v- | ) | |
| Central New Mexico Treatment Center<br>Angela Goolsby Lucero Program Director CNMTC<br>Nurses, CNMTC Counselors | )<br>)<br>)<br>) | |
| Defendant(s) | ) | 19cv762 SCY |
| (Write the full name of each defendant who is being sued. If the names of all the defendants cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.) | )<br>)<br>)<br>) | |

## COMPLAINT FOR A CIVIL CASE ALLEGING NEGLIGENCE
(28 U.S.C. § 1332; Diversity of Citizenship)

I.  The Parties to This Complaint A.      The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

| | |
|---|---|
| Name | Wilfred A Page et al CNMTC Patients |
| Street Address | 1509 Erbbe Street NE |
| City and County | Albuquerque, Bernalillo |
| State and Zip Code | New Mexico 87112 |
| Telephone Number | (505)859-0688 |
| E-mail Address | Wilfred.Page@GuardianWillOfGod.Info |

Pro Se 5 (Rev. 12/16) Complaint for a Civil Case Alleging Negligence

B.    The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title (if known). Attach additional pages if needed.

Defendant No. 1

| | |
|---|---|
| Name | Angela Gooslby-Lucero |
| Job or Title (if known) Street | Central New Mexico Treatment Center Program Director |
| Address | 630 Haines Ave. NW |
| City and County | Albuquerque, Bernalillo |
| State and Zip Code | New Mexico 87120 |
| Telephone Number | (505) 268-5611 |
| E-mail Address (if known) | angela.lucero@cmglp.com |

Defendant No. 2

| | |
|---|---|
| Name | |
| Job or Title (if known) Street | |
| Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |
| E-mail Address (if known) | |

Defendant No. 3

| | |
|---|---|
| Name | |
| Job or Title (if known) Street | |
| Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |
| E-mail Address (if known) | |

Defendant No. 4

| | |
|---|---|
| Name | |

Pro Se 5 (Rev. 12/16) Complaint for a Civil Case Alleging Negligence

Job or Title (if known) Street

Address _____

City and County _____

State and Zip Code _____

Telephone Number _____

E-mail Address (if known) _____

II.    Basis for Jurisdiction

Federal courts are courts of limited jurisdiction (limited power). Under 28 U.S.C. § 1332, federal courts may hear cases in which a citizen of one State sues a citizen of another State or nation and the amount at stake is more than $75,000. In that kind of case, called a diversity of citizenship case, no defendant may be a citizen of the same State as any plaintiff. Explain how these jurisdictional requirements have been met.

A.    The Plaintiff(s)

1.    If the plaintiff is an individual

The plaintiff, (name) ___Wilfred Alexander Page et al CNMTC Patents___ is a citizen of the State of (name) ___New Mexico___ .

2.    If the plaintiff is a corporation

The plaintiff, (name) ___, is incorporated under the laws of the State of _____ (name) ,

and has its principal place of business in the State of (name) _____ .

_____

(If more than one plaintiff is named in the complaint, attach an additional page providing the same information for each additional plaintiff.)

B.    The Defendant(s)

1.    If the defendant is an individual

The defendant, (name) ___Angela Goolsby Lucero___ , is a citizen of the State of (name) ___. Or is a citizen of _____ (foreign nation) _____ .

2.    If the defendant is a corporation

The defendant, (name) ___Central New Mexico Treatment Center___ , is incorporated under

Pro Se 5 (Rev. 12/16) Complaint for a Civil Case Alleging Negligence

the laws of the State of (name)    New Mexico                          , and has its

principal place of business in the State of (name)    Florida                          .

Or is incorporated under the laws of (foreign nation)                          ,

and has its principal place of business in (name)                          .

(If more than one defendant is named in the complaint, attach an additional page providing the same information for each additional defendant.)

C.    The Amount in Controversy

The amount in controversy—the amount the plaintiff claims the defendant owes or the amount at stake—is more than $75,000, not counting interest and costs of court, because (explain):

(1) One Million US Dollars (1,000,000.00)

III.    Statement of Claim

Write a short and plain statement of the claim. Do not make legal arguments. State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought. State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

On (date)02/12/2018 to Present , at (place)    Central New Mexico Treatment Center                          ,

the defendant(s): (1) performed acts that a person of ordinary prudence in the same or similar circumstances would not have done; or (2) failed to perform acts that a person of ordinary prudence would have done under the same or similar circumstances because (describe the acts or failures to act and why they were negligent)

Several Occasions unauthorized personal logged into the Methasoft Program and tampered with Dr's Notes, Dosing MG, Unnecessary Stop Doses, Unauthorized grievances against multiple persons, Dosing Increases and Illegal Unauthorized Dose Reductions on multiple patients as well as Unauthorized Removal of Persons from the Methadone Maintenance Treatment (MMT) Program that is Overseen by Multiple State and Federal agencies and Breach of Contract in the form of the Treatment Plans set from patients.

The acts or omissions caused or contributed to the cause of the plaintiff's injuries by (explain)

Severe Mental and Physical Anguish and Withdraw et al CNMTC Patients. Several hospitalizations from multiple patients resulting in Hospitalization from Comatose caused by adverse reactions from Angela Goolsby Lucero kicking patients out of the (MMT) Program and calling other Methadone Clinics and Illegally banning said patients from dosing. Several other patients died as a result of Mrs. Lucero's thoughtless dangerous actions. Several times I myself went to Mrs. Lucero to help resolve problems I was having regarding Nurses, Counselors, and other CNMTC Staff in which said occurances where recorded and Mrs. Lucero deliberately lying telling me

Pro Se 5 (Rev. 12/16) Complaint for a Civil Case Alleging Negligence

IV.    Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order. Do not make legal arguments. Include any basis for claiming that the wrongs alleged are continuing at the present time. Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts. Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

I am at this time requesting that the matter at hand be submitted as a Class Action Lawsuit in which I Wilfred Alexander Page am the Class Action Member. The hundreds of patients that have received similar and often times much more severe harassment from Mrs. Goolsby Lucero and the CNMTC Staff as a whole are the peoples on whose behalf, I am bringing these charges.

V.    Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

A.    For Parties Without an Attorney

I agree to provide the Clerks Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerks Office may result in the dismissal of my case.

Date of signing:         08/18/2019

Signature of Plaintiff

Printed Name of Plaintiff    Wilfred Alexander Page

B.    For Attorneys

Date of signing:

Pro Se 5 (Rev. 12/16) Complaint for a Civil Case Alleging Negligence

Signature of Attorney        _____

Printed Name of Attorney     _____

Bar Number                   _____

Name of Law Firm             _____

Street Address               _____

State and Zip Code           _____

Telephone Number             _____

E-mail Address               _____

Filename:             Wilfred A Page v CNMTC Civil Neglagance lawsuit
Directory:            C:\WINDOWS\System32
Template:
                      C:\Users\willf\AppData\Local\Packages\Microsoft.Office.Desktop_8wek
        yb3d8bbwe\LocalCache\Roaming\Microsoft\Templates\Normal.dotm
Title:                US District Court Complaint for a Civil Case Alleging Negligence.pdf
Subject:
Author:               willf
Keywords:
Comments:
Creation Date:        8/18/2019 8:18:00 AM
Change Number:        2
Last Saved On:        8/18/2019 8:18:00 AM
Last Saved By:        Will Fresquez
Total Editing Time:   4 Minutes
Last Printed On:      8/18/2019 8:23:00 AM
As of Last Complete Printing
    Number of Pages:   6
    Number of Words:  1,284 (approx.)
    Number of Characters:      7,322 (approx.)



International Journal of Law and Psychiatry 26
(2003) 55–71

**Pergamon**



# The Broward Mental Health Court: process, outcomes, and service utilization

Roger A. Boothroyd*, Norman G. Poythress, Annette McGaha, John Petrila

Department of Mental Health Law and Policy, Louis de la Parte Florida Mental Health Institute,
University of South Florida, 13301 Bruce B. Downs Boulevard, Tampa, FL 33612, USA

## 1. Introduction

Mental health courts are one of a variety of special jurisdiction courts that have been created in a number of countries, including the United States (Petrila, 2003). While there is no prototypical mental health court (Steadman, Davidson, & Brown, 2001; Watson, Luchins, & Hanrahan, 2001), most of those in existence today share several common characteristics. These include (a) the creation of a special docket (usually, but not always, nonviolent misdemeanants with mental illness) that is (b) handled by a particular judge, with (c) a primary goal of diverting defendants from the criminal justice system and into treatment (Goldkamp & Irons-Guynn, 2000).

In addition, the principle of therapeutic jurisprudence has been influential as a philosophic basis for the creation of some if not all mental health courts. "Therapeutic jurisprudence" has been offered as a way for courts and attorneys to examine "the extent to which substantive rules, legal procedures, and the roles of lawyers and judges produce therapeutic or antitherapeutic consequences" (Wexler & Winick, 1991). Both mental health court (Wren, 1998) and drug court judges (Hora, Schma, & Rosenthal, 1999) have been explicit in their reliance on therapeutic jurisprudence as the underpinning of their courts.

We are currently evaluating the Broward County Florida Mental Health Court (MHC), one of the first mental health courts in the United States.[1] Full details of this evaluation are

---

\* Corresponding author. Tel.: +1-813-974-1915; fax: +1-813-974-9327.
E-mail address: boothroyd@mirage.fmhi.usf.edu (R.A. Boothroyd).

[1] The Broward Court, created in 1997, appears to have been the first mental health court created in the 1990s, subsequent to the widespread development of drug courts. However, a court in Marion County, IN, created in 1980, may have the distinction of being the first mental health court created in the United States (Steadman et al., 2001).

0160-2527/03/$ – see front matter D 2003 Elsevier Science Inc. All rights reserved.

PII: S0160-2527(02)00203-0

described elsewhere (McGaha, Boothroyd, Poythress, Petrila, & Ort, 2002; Petrila, Poythress, McGaha, & Boothroyd, 2001). In one part of the evaluation, we have examined the MHC process itself, including the volume and nature of courtroom communications and formal outcomes. We have also gathered data on the utilization of treatment services by individuals in the MHC as well as by individuals in a traditional misdemeanor court chosen as a comparison site (Hillsborough County). In this article, we report findings from these two aspects of the evaluation, referring to them as Study 1 (the court process) and Study 2 (the utilization data).

## 2. Study 1: description of mental health court process and outcomes

The Broward Court, like many drug and mental health courts, describes itself explicitly as a treatment court. In treatment courts, the roles of the judge and counsel are often characterized as less adversarial than in traditional court, with an emphasis on enabling the defendant to gain access to treatment and other supports.

Informal observations of the Broward Court indicated a substantial role for the defendant, presumably because of the court's desire to create an alliance with the defendant. Our descriptive study of the court process focused on the extent to which various participants were involved in the proceeding and the topics that were discussed. In contrast to traditional misdemeanor court, where informal observation revealed that the primary focus of the proceedings was to move the case to a legal disposition,[1] we anticipated that discussion of formal legal issues would be minimal in light of the greater focus on mental health and treatment related topics. At the same time, however, the defendant's entry into the mental health court must be voluntary[2] and, as in any criminal proceeding, defendants must be considered competent to proceed.[3] Thus, we examined the extent to which these issues were addressed in the transcripts.

Finally, our informal observations of the Broward Court suggested that, despite its emphasis on linking defendants to treatment, neither the treatment linkages nor the formal legal outcomes were identical across all cases. A mental health court such as the Broward Court has a variety of ways in which it might resolve a case. The court may close a case at first hearing, or it may keep the case open (in order to maintain jurisdiction) and monitor the defendant's progress in treatment through subsequent "status" hearings. It is important to understand how these paths were articulated and how many defendants were placed on each path. Similarly, there may be variations in the court's stated expectations regarding treatment. As our evaluation progressed, it became evident that some individuals did not enter mental

---

[1] In Study 2 below, we describe a sample of cases from a traditional misdemeanor court.

[2] Defendants have the right to decline participation in the mental health court and have their cases heard in a regular misdemeanor court. As the discussion below suggests, not all defendants report that they are aware of this right.

[3] There is a legal presumption of competence that can be challenged by either party or by the court; in the absence of such a challenge, cases are allowed to proceed.

R.A. Boothroyd et al. / International Journal of Law and Psychiatry 26 (2003) 55–71          57

health treatment from the mental health court. That could have reflected a lack of follow-up by the court or treatment providers, or it could have reflected a decision by the court to simply close a case. In order to attempt to understand this issue more clearly, we thought it important to ascertain how the court framed its expectations regarding the question of subsequent treatment for the defendant.

## 2.1. Method

### 2.1.1. Coding of court transcripts

Our prospective study of the MHC included 121 defendants whose cases were accepted into the court between December 1, 1999 and April 30, 2001 (see Study 2 below for a description of the sample). To evaluate the court process and outcomes for these cases, we obtained and coded official court transcripts for these cases.[4]

A comprehensive form was created for coding the content of the transcripts. Content categories related to legal issues (e.g., mention of the voluntary nature of the court, mention of the defendant's competence, mention of current or prior offenses), mental health issues (mention of current or past illness, treatment, use of psychotropic medications, etc.), and disposition (legal findings, directives into treatment). A dozen cases were initially coded by the third author and a graduate student, resulting in high levels of agreement across all categories. Subsequently, the graduate student coded the remaining cases. 2.2. Results

### 2.2.1. Who talks at mental health court?

From a simple count of the number of times a participant was listed as a speaker in each transcript, the mean numbers of utterances for each participant was calculated. On average, about 54 utterances were made at initial hearings in mental health court. The judge, defendant, mental health staff, public defender, and state attorney were usually the only people who spoke. The process was substantially a dialogue between the judge—who typically was responsible for nearly half (47%) of the communications at the hearing (M=25.72, S.D.=19.21) and the defendant—whose comments accounted for 33% of the utterances on the record (M=17.39, S.D.=15.75). The remaining comments came from the mental health staff (7%) and attorneys (12%). The mental health staff did not testify as sworn witnesses, nor did they (or any other witnesses) take the witness stand. Rather, they merely responded from the floor, usually in response to queries from the judge. Very infrequently, and usually very briefly, a friend or family member of a defendant also spoke at the hearing.

### 2.2.2. What is discussed at mental health court?

Both legal and clinical issues appeared in the MHC transcripts. Two important legal issues relevant to MHC participation include (a) the defendants' understanding that the primary focus of the court is on treatment involvement rather than adjudication of the legal case and (b) the defendants' understanding that participation in the court is voluntary—defendants

---

[4] We are grateful to the MacArthur Foundation Research Initiative on Mandated Community Treatment for funds used to purchase the mental health court transcripts. Copies of transcripts could not be obtained from the legal transcription service for 17 of the mental health court cases; therefore these analyses are based on 104 cases.

choose to have their case adjudicated in a regular misdemeanor court rather than in MHC. Our coding of the transcripts revealed that the primary purpose and focus of the MHC was explicitly announced in 28.4% of cases.[5] In 15.7% of cases, the transcript included explicit statements by the judge regarding voluntary participation and/or the defendant's prerogative to have his or her case transferred to regular misdemeanor court.[6]

The transcripts contained some mention of a defendant's competence-to-proceed in 29.4% of cases. When this issue did arise, the court declared the defendant to be competent 73.3% of the time and incompetent in only 3.3% of cases. Mental health evaluations were ordered in 13.3% of these cases; in 10% of the cases in which the issue was mentioned, the action taken (if any) was not clear from the record.

Consistent with the court's identification as a "treatment court," the presentation of material related to the pending criminal charges was cursory. Although the name or nature of the defendant's charge was mentioned in 70.6% of cases, this most commonly occurred in a single utterance when the judge called the case from the docket, as in "The next case is Mr. ___, who is here on a charge of trespassing." In only 2.9% of cases did any other information about the charge appear on the record and witnesses to the offense were never called for questioning. Observation of the court by the authors suggests that the court avoided extended discussion of the pending charges to avoid compromising the defendant's right to avoid self-incrimination. A defendant's prior record was alluded to in 58.8% of the cases, usually when the court was considering public safety issues in contemplation of disposition. No detail on prior offenses was found in any transcript.

Mental health issues were discussed in most cases and these discussions were typically more extensive than were those of legal issues. Transcripts revealed that defendants' current or prior symptoms and diagnoses (42.2%), use of psychotropic medications (24.5%), and treatment/placement issues (83.6%) were the most commonly explored mental health issues. Other issues related to mental health and social adjustment that arose with some frequency included housing (34.0%) and employment (10.2%).

### 2.2.3. Case outcomes

At the conclusion of the initial hearings in MHC, the defendant's legal case remained open in about one-third (36%) of cases. These cases were usually scheduled for a "status hearing" several weeks later at which the court would receive information about the defendant's participation and progress in treatment and reconsider legal disposition of the case.

---

[5] It is highly likely, however, that more than 28.4% of the defendants in our sample were aware of the primary purpose and focus of the mental health court and more than 15.7% were aware of the voluntary nature of the court. In our frequent observations of the court, the judge sometimes, prior to calling cases, offered a blanket statement to all present in the court, including the array of defendants waiting to have their individuals' cases called. This blanket statement sometimes included statements about the treatment approach of the court, the voluntary nature of the court, or both.

[6] A slight majority (53.7%) of the clients indicated being told about the voluntary nature of the court when asked in their enrollment interviews. However, over half (54.7%) of those who indicated such knowledge said they were told about the voluntary nature of the court after their initial hearing. Clients self-reported that they were told about the voluntary nature of the court by the public defender (31.8%), judge (28.8%), and mental health professionals (25.8%).

In most other instances,[7] the court made a legal disposition of the case. In 26% of cases, the defendant was found "guilty" and credited with time served (21%) and/or assigned a brief period of probation (5%). Charges were formally dismissed in 2% of cases and, in the remainder (39%) of cases, the disposition was "adjudication withheld," usually (33% of all cases) without probation.[8]

### 2.2.4. Treatment linkages

Our informal observations of court hearings revealed a variety of ways through which the MHC attempts to link defendants to mental health services. Often the defendant was someone already known to the local treatment community and had been involved in treatment prior to his or her arrest on the index offense; the court in such cases typically sought to identify the existing treatment provider and to encourage the defendant to continue with a previously established treatment plan. Some defendants had been referred to a crisis stabilization unit either from the jail, or after appearing before the MHC at a first appearance in such an acute state that they appeared unable to consent competently to participation in the court. Such defendants often returned to the court within a week or two after stabilization and with a treatment plan that had been developed during this initial intervention; linkage in this case was commonly to encourage the defendant to pursue this newly established plan.

A second type of linkage was derived from the recommendations of the mental health staff that evaluated defendants as they came into court. These brief assessments sometimes resulted in recommendations to the judge for referrals to specific community agencies known to provide services appropriate to the assessed needs. In these cases, the client was referred to the specific agency (sometimes with assistance from court personnel in making the initial appointment) and/or provided funding for initial transportation to the service agency.

Finally, it was observed in some cases that the court-based either on recommendations of court mental health staff or self-reported needs of the defendant—would merely provide general information (e.g., an agency name and address, an agency brochure describing services) about where services might be sought. These defendants were encouraged and exhorted to follow-up on their own, and the court did not explicitly commit court resources (personnel or transportation funds) to assist in making the linkage.

Each of these linkage methods was reflected in the transcripts of our sample of MHC defendants. The primary linkage strategies utilized by the court involved either referral to an agency with which the defendant had a previous or recently established treatment plan (35.3%), or referral to a specific agency deemed to provide services appropriate with assessed needs (35.3%). A small group of defendants (11.1%) was encouraged to initiate treatment

---

[7] In about 3% of the transcripts, legal disposition of the case was not explicit.

[8] Florida courts have the authority to withhold an adjudication of guilt and may also place the defendant on probation. Fla. R. Crim. P. 3.670 (2002). According to the Honorable Ginger Lerner Wren, who presides over the Broward County MHC, "adjudication withheld" is used as an outcome at the end of a case; she views this as a verdict "softer" than a verdict of guilty (personal communication between Judge Lerner Wren and John Petrila, July 9, 2002).

R.A. Boothroyd et al. / International Journal of Law and Psychiatry 26 (2003) 55–71

contacts largely through their own efforts and, for about 18% of defendants, the court transcript did not include explicit linkage information.[9]

### 2.2.5. Equity in the mental health court process

In a final set of analyses, we examined whether various aspects of the MHC process and outcomes, as described above, were administered equitably across race and gender.

We found no evidence of differential treatment by race (Caucasian, n=64 vs. African–American, n=23) in terms of the extensiveness of the hearings.[10] Transcripts revealed a mean of 63.00 utterances (S.D. = 48.1) in 21 cases involving African–American defendants compared to 52.35 (S.D.=36.8) utterances in 62 cases involving Caucasian defendants [$t(81)$=1.26, P=.213]. Similarly, the mean number of utterances in hearings involving 28 female defendants—59.96 (S.D.=44.09) did not differ significantly from the mean in the hearings of 65 male defendants—52.71 (S.D.=41.20) [$t(91)$=0.77, P=.44].

A pair of 2 2 contingency tables was constructed to compare legal disposition (adjudicated guilty vs. adjudication withheld) separately by race (Caucasian vs. African American) and by gender. These analyses revealed no significant difference in the proportion adjudicated guilty either by race ($c^2$=0.34, P=.56) or by gender ($c^2$=3.08, P=.08).

Contingency tables were constructed to compare the distribution of three treatment linkage strategies (described above) separately across groups by race (African–American vs. Caucasian) and gender. These analyses revealed no significant difference in the utilization of treatment linkage strategies either by race ($c^2$=0.14, P=.93) or by gender ($c^2$=0.63, P=.73).

## 3. Study 2: pathways into treatment and mental health service utilization

In Study 2, we explored the use of mental health services by defendants in the Broward MHC, including a comparison with mental health service utilization by a group of mentally ill misdemeanants tried in a traditional misdemeanor court. Three specific questions were addressed:

Does involvement with the MHC affect the likelihood that a misdemeanant with mental health problems will subsequently receive treatment?

Among defendants who access behavioral health services, does the MHC impact the volume of services a defendant received?

Among defendants whose cases are heard in the MHC, what is the relationship between the use of mental health services and type of service linkage strategy noted in the court transcript?

### 3.1. Method

---

[9] Because of the (sometimes extensive) off-the-record conversations between the court mental health staff and defendants, it is possible that explicit treatment linkage strategies were communicated to some of these defendants.

[10] Analyses by race were limited to African–American and Caucasian defendants, as these were the only categories with sizeable numbers for comparisons.

### 3.1.1. Participants

The Broward MHC sample (n=121) consisted of English-speaking defendants of either gender, between the ages of 18 and 64, whose cases were accepted by the MHC between December 1, 1999 and April 30, 2001. MHC jurisdiction depends on judicial findings that the individual (a) is charged with a nonviolent misdemeanor, ordinance violation, or criminal traffic offense;[11] (b) currently has, or previously has had, mental health problems;[13] (c) is able and willing to make a voluntary choice to have the case disposed in the MHC; and (d) would not pose significant public safety concerns. Individuals not meeting all of these criteria are returned to a regular misdemeanor court for disposition of their cases.

Our comparison group included 101 defendants from another county in Florida that does not have a MHC but who met the criteria (a) and (b) above for MHC jurisdiction in Broward County. Each currently had, or reported a history of, mental health problems.[12] To minimize the chance that clinical and demographic variables would be confounded with site differences in this study, our design called for the MHC and comparison samples to be matched on certain demographic variables (age, gender, race) and on current mental status. Thus, the recruitment in the comparison county lagged recruitment in the Broward MHC by a couple of months in order to permit selection of comparison clients whose demographic and clinical features matched those of the Broward sample.

The characteristics of the subjects from the Broward County Mental Health Court and the comparison court in Hillsborough County are summarized in Table 1.[13] Data are only reported on 116 mental health court clients and 97 comparison court clients as several participants in each group had requested to be disenrolled from the study and as such their data have been excluded from these analyses. As can be seen, the procedure for matching samples was successful; no significant differences were found between the two groups of defendants in terms of gender, race/ethnicity, age, or overall level of psychopathology

Table 1

Characteristics of study participants

| Characteristic | Mental health court (n=116) | Comparison court (n=97) | P |
|---|---|---|---|
| Gender: | | | NS |

[11] Individuals charged with misdemeanor battery offenses may be accepted into MHC if the victim in the case agrees to this route of disposition. The Broward MHC does not accept persons charged with domestic violence or driving while intoxicated charges. 13 Mental health screening is conducted in court or just prior to court by mental health professionals who work with the court or graduate students in clinical psychology from Nova Southeastern University working under supervision (Rabaska, 2000). However, the court may accept jurisdiction in the absence of formal diagnostic findings.

[12] In the comparison county, defendants with mental health issues were not automatically identified by the fact of their referral to/acceptance by a MHC. Thus, at the control site, research assistants identified individuals at the daily first appearance court with charges of a nature that would allow them into the mental health court. Those of this subset, who were housed on mental health units in the jail, were referred for psychiatric care/assessment in the jail, or who based on observation were possible candidates were considered for interviews. When the presence of current symptoms and/or a history of mental illness was questionable prior to the consent process the research assistant conducted a brief screen to probe on issues such as current symptoms and history (see McGaha et al., 2002 for more details).

[13] Due to a small number of cases with missing data, the n's reported here differ slightly from those reported in Poythress et al. (2002).

| | | | |
|---|---|---|---|
| Male | 68.1% | 58.8% | |
| Female | 31.9% | 41.2% | |
| Race/ethnicity: | | | NS |
| White | 61.3% | 55.7% | |
| Black | 23.5% | 21.6% | |
| Hispanic | 9.2% | 9.3% | |
| Other | 5.9% | 13.4% | |
| Age: | | | NS |
| Mean | 38.4 | 38.0 | |
| S.D. | 10.53 | 9.61 | |
| Range | 18–63 | 20–57 | |
| BPRS score: | | | NS |
| Mean | 34.143 | 34.11 | |
| S.D. | 9.83 | 7.79 | |
| Range | 18–65 | 18–55 | |

(measured using the Brief Psychiatric Rating Scale—Anchored Version: Woerner, Mannuzza, & Kane, 1988).

### 3.1.2. Measures and procedure

3.1.2.1. Self-reported mental health service use. As part of a larger interview-based research protocol (Petrila et al., 2001) and using procedures described elsewhere in greater detail (Poythress, Petrila, McGaha, & Boothroyd, 2002), self-report data on the use of mental health, medical, and substance abuse services were obtained from subjects in the MHC and comparison samples. Briefly, participants were recruited using procedures approved by the University of South Florida Institutional Review Board. Informed consent was obtained at enrollment, and trained research assistants contacted participants 1, 4, and 8 months after

enrollment for subsequent administrations of the protocol.[14] Each participant was paid US$20 upon completion of each protocol administration.

3.1.2.2. *Administrative data sources.* Additional data were obtained from administrative data sets available to our research team. We retrieved records of all mental health and substance abuse services paid for by either Medicaid or State general revenue dollars for all 213 participants for the 8-month period preceding enrollment in the study and for the 8-month period postenrollment (the same time period covered by the self-report data).

3.1.3. *Analyses*

A two-group repeated measures analysis of variance (ANOVA) was conducted using the administrative data to assess for group differences in the service penetration rates and the volume of services defendants received in the 8 months before and after their initial court appearance. Penetration was defined as having received any treatment at all (regardless of the number or type of services received) during the time frame of analysis, while volume was a gross measure of treatment involvement computed by totaling the number of discrete service units received.

Independent t-tests were conducted on the self-report data to compare the service penetration rates and volume of service between the two groups during the 8 months following their court appearance. Finally, for those defendants whose cases were heard in the mental health court, the relationship between the use of services and type of service linkage strategy noted in the court transcript (see Study 1) was examined using chi-square analyses.

3.2. *Results*

The findings are summarized by the major research questions.

3.2.1. *Does involvement with the MHC affect the likelihood a misdemeanant with mental health problems will subsequently receive treatment?*

Analyses of administrative and self-report service use data were conducted to compare the penetration rates for defendants served by the mental health and comparison court. Given that 22 of the defendants returning to the MHC came directly from a hospital or crisis stabilization unit and therefore were more likely to have an existing treatment plan and the fact that similar defendants in the comparison court could not be identified and enrolled in the study, these 22 defendants were omitted from the analysis to permit a fairer and more conservative comparison of the impact of the MHC in engaging individuals in treatment. The results of this analysis are summarized in Fig. 1.

As is shown in this figure, no significant difference was found in the behavioral health service penetration rates between sites prior to enrollment into the study [t(197)=1.06, P<.29],

---

[14] The 8-month timeframe for follow-up with the comparison group was driven by another aspect of the research that involved analyses related to criminal recidivism. For the MHC group, additional waves of interviews at 12 and 16 months provided further service use data (not reported here).

although misdemeanants in the Broward County MHC were slightly more likely to have received behavioral-health services in the 8 months prior to enrollment in the study (36%) compared to individuals residing in Hillsborough County (29%). However, even when controlling for these small initial differences in service utilization, a significant county-by-time interaction was found [F(1,197)=6.21, P=.05]. The use of behavioral health services by defendants whose cases were heard in the MHC increased significantly during the 8 months following enrollment in the study (from 36% to 53%), while the likelihood of using services among defendants in the comparison court remained virtually unchanged



Fig. 1. Pre- and post-service penetration rates (administrative and self-report data).

(from 29% to 28%). The effect size of this difference in administrative data penetration rate during 8 months following the initial court appearance is 0.52, a moderate effect according to Cohen (1977).

Administrative service utilization data were available on 21 different behavioral health services. Higher rates of service use were reported by defendants served by the mental health court in 14 of the 21 service categories. A sign test performed on these findings suggest the probability of this occurrence is P=.09, assuming a random effect (50–50). Interestingly, the service categories in which defendants from the comparison court had higher levels of utilization were emergency services and more intensive levels of residential treatment.

A related analysis investigated whether the defendants using services after their initial court appearance were the same individuals who were using services prior to their court appearance. These findings are summarized in Table 2. A chi-square analysis was performed to determine if the pre- to postservice utilization patterns differed between courts and a significant difference was found [c²(3, n=192)=13.76, P=.003]. As is shown in this table, defendants in the comparison court were more likely to not be using services both before and after their court appearance relative to those who appeared in the mental health court. Additionally, comparison court defendants were less than half as likely to begin treatment after their court appearance and nearly 50% more likely to stop receiving treatment after their court appearance relative to mental health court defendants.

Table 2
Service use patterns pre- and post-court appearance (administrative data)

| | Mental health court (n=95) | Comparison court (n=97) | P< |
|---|---|---|---|
| Service use pattern: | | | .003 |
| No services used pre or post | 36.8% | 58.8% | |
| Services used both pre and post | 28.4% | 17.5% | |
| Services used post but not pre | 26.3% | 11.3% | |
| Services used pre but not post | 8.4% | 12.4% | |

Service penetration rates for the 8 months following court appearance were also examined using defendants' self-report data. Due to the inability to conduct follow-up interviews after the initial court appearance, 10 MHC defendants (10.3%) and 9 comparison court defendants (8.9%) were lost to attrition. The number of interviews among those who were interviewed differed significantly between the two sites [t(177) =2.26, P< .05]. Self-report service utilization was based on an average of 2.08 interviews (out of 3) among mental health court defendants and 2.35 interviews among those in the comparison court. The smaller number of interviews among MHC recipients decreases the opportunity for them to report service use, also making this a conservative analysis. Despite this fact, MHC participants were more likely to have reported receiving behavioral-health services during the 8-month follow-up period (73%) than were participants from the comparison court (60%); however, this difference is not significant statistically [t(188.97)=1.89, P=.61][15] (also see Fig. 1). Despite failing to reach a classical level of significance, the effect size associated with this difference in self-reported penetration rate during 8 months postcourt appearance is 0.27, a small effect.

During each interview, respondents were asked about their use of 27 different types of mental health and substance abuse services. Higher rates of service use were reported by MHC defendants in 20 of the 27 service categories. A sign test performed on these results indicate the probability of this occurrence is P<.05, again assuming a random effect (50–50). Similar to the findings based on the administrative data, many of the service categories in which defendants served by the comparison court reported higher levels of service utilization involved emergency services and detoxification.

3.2.2. Among individuals who accessed behavioral health services, did the MHC impact the volume of services a defendant received?

Between defendants in the two courts who reported receiving any service at all, the mean number of service units received was compared to assess whether there was a difference in the volume of behavioral health services received by MHC and comparison court defendants. A two-group repeated measure ANOVA was performed on the administrative data to assess for group differences in the volume of services received in the 8 months before and after court appearance. These results are summarized in Fig. 2.

---

[15] Degrees of freedom have been adjusted for unequal group variances.

A significant group-by-time interaction [$F(1,196)=6.27$, $P=.013$] was obtained. The mean number of units of behavioral health services defendants in the mental health court received increased by 61.6% (from 18.23 units in the 8 months before to 29.47 units in the 8 months after), while the number of units of service for defendants served by the traditional misdemeanant court decreased by 18.3% (from 19.25 to 15.72 units). The effect size of this difference in service volume during 8 months postcourt appearance is 0.44, bordering on a moderate effect.

A similar analysis was conducted based on defendants' self-report service use data. Significant differences were found in the volume of behavioral health services favoring



Fig. 2. Pre- and post-service volume (administrative and self-report data).

mental health court defendants [$t(89.05)=5.43$, $P<.001$]. MHC service users reported an average of 61.57 units of service in the 8 months following their court appearance, while those in the traditional court reported an average of 15.84 units of service during the same time period. This difference represents a large effect (1.91).

3.2.3. What is the relationship between their use of mental health services and the type of service linkage strategy noted in the mental health court transcript?

Chi-square analyses were conducted to examine the relationship between court expectation and anticipated treatment linkages noted in the court transcripts and the likelihood of defendants' subsequent service use (see Table 3). No significant relationship was found between the type of treatment expectation noted in the court transcript and the likelihood that defendants would use behavioral health services in the 8 months following their hearing. This was true for both the self-report [$c^2(3, n=74)=4.33$, $P=NS$] and administrative service data [$c^2(3, n=76)=2.75$, $P=NS$]. There was no explicit mention of treatment in the court transcripts of 15.0% of the defendants reporting no service use in the 8 months following their initial court appearance; there was also no explicit mention of treatment in the court transcripts of 16.7% of the defendants who reported service use during this period. Examination of the administrative data, however, reveals a somewhat different finding. Only

Table 3
Receipt of behavioral health services by level of treatment expectation and service data source

| Treatment expectation noted in transcript | Self-report | | Administrative | |
|---|---|---|---|---|
| | Used | Did not use | Used | Did not use |
| No mention of treatment (n=15) | 73.3% | 26.7% | 53.3% | 46.7% |
| Provided general referral information (n=10) | 40.0% | 60.0% | 70.0% | 30.0% |
| Continue with existing treatment plan (n=35) | 80.0% | 20.0% | 48.6% | 51.4% |
| Provide with a explicit referral (n=34) | 76.5% | 23.5% | 64.7% | 35.3% |

12.5% of the defendants who used services in the 8 months after their court appearance had no mention of treatment in their court transcripts compared to 22.2% defendants who did not use services. Although not statistically significant, this represents a large effect (effect size=0.89).

4. Discussion

The findings from these studies provide some interesting insights into the Broward MHC process as well as preliminary data regarding service utilization of defendants in the MHC and in a traditional misdemeanor court. The court transcript analyses in Study 1 provide a quantitative and systematic accounting of the court process that distinguishes the MHC from traditional misdemeanor courts. First, the judge appears to have chosen a strategy of deliberately engaging the defendant in a conversation regarding the defendant's perceived treatment needs; there is little that reflects traditional "lawyering" as the attorneys are relegated to relatively minor roles in the hearings. The transcripts also show a focus on treatment issues that is consistent with the court's self-characterization as a "treatment court." The offense itself is rarely discussed. As noted above, our live observations of the court suggest that the court deliberately stays away from discussion of specific details regarding the offense in large part because of a desire to avoid self-incrimination issues in the event the case has to be handled in an ordinary misdemeanor court. Regardless, discussion between the judge and defendant of treatment-related issues comprises the bulk of conversations in the court.

The transcripts also reveal that not all cases before the MHC take the same path. As noted above, the court closed 63% of the cases in our sample at the initial hearing, with a small percentage of these defendants placed on probation. In only about one-fourth of cases was the defendant adjudicated guilty; more often the disposition is "adjudication withheld" and no conviction appears on the defendant's criminal record. This is in stark contrast to the results reported from other studies of other, more traditional misdemeanor courts. For example, Poythress, Bonnie, Hoge, Monahan, and Oberlander (1994) reported that upwards of 90% of misdemeanor cases in Hillsborough County (the comparison site in Study 2) resulted in pleas of either guilty or no contest. In about one-third of cases, the judge in the Broward MHC continues the case, apparently as a mechanism for maintaining jurisdiction so that cases can be monitored, through "status hearings," for oversight of the person's mental status and use

68        R.A. Boothroyd et al. / International Journal of Law and Psychiatry 26 (2003) 55–71

of mental health services. This is important in considering how judicial and other resources are allocated in special jurisdiction courts. The Broward Court, at least, does not use a ''onesize fits all'' approach to all cases.

Findings from both studies are interesting in light of the potential presumption among policy makers and others that all defendants who come before the MHC are linked to treatment. Although it is the court's aspiration that defendants do engage in and comply with mental health services, the court transcripts revealed explicit treatment-linkage strategies in only 82% of cases (Table 2). In Study 2, only 73% of mental health court clients self-reported involvement in treatment during the 8-month period following their court appearance, and an even smaller portion (57%) were documented as having received Medicaid or state-funded mental health services.[16]

Given that many of its clients are individuals with chronic illnesses who may long have been difficult to engage in treatment, and given the court's limited staff resources to monitor its treatment directives, the fact that not every defendant appearing before the court receives treatment is not surprising. This outcome is also consistent with the court's aspiration to be a noncoercive influence in the lives of its clients. As noted by Goldkamp and Irons-Guynn (2000) and supported by our transcript data, the Broward Court rarely if ever uses punishment (e.g., probation or jail time served) and in many cases is not particularly specific or directive in articulating its expectations regarding treatment.

At the same time, the findings from Study 2 suggest that involvement with the Broward MHC increases the likelihood that defendants will become engaged in the mental health treatment system. There is also evidence based on the cumulative number of service units received that suggests that individuals who do receive treatment receive a higher or more intense dosage of treatment than defendants in the study who appeared before the traditional misdemeanor court. Although the impact of these services on the longer-term outcomes of the defendants is at this time unknown, it is well documented that the ''...evidence for treatment being more effective than placebo is overwhelming'' (Department of Health and Human Services, 1999, p. 65).

It also is worth noting that the categories in which comparison court defendants appeared (based on self-reports or administrative data) to have higher levels of service utilization were typically crisis or emergency services or more intensive levels of residential treatment. While our cost analysis study of the Broward MHC and comparison court is on-going, the services used more frequently by defendants in the comparison court are generally associated with higher cost service categories.

These results in the aggregate appear to provide clear evidence that the Broward MHC meets its goal of facilitating access to treatment, albeit imperfectly. The findings from Study 2 do suggest that a greater proportion of defendants in the MHC do subsequently utilize

---

[16] Such differences between self-report and administrative data are not uncommon (see Stiles, Boothroyd, Snyder, & Zong, 2002 for discussion). While there are many reasons why self-report penetration rates and service volume are consistently higher than those obtained from administrative data sources, prominent among these are that administrative data are restricted by pay or source (in these analyses Medicaid and state general revenue) while self-report data are independent of this limitation and can include informal service sources such as self-help groups (e.g., AA).

mental health services than defendants in the traditional misdemeanor court. It also appears that this occurs in a manner that enhances procedural fairness while minimizing perceived coercion (Poythress et al., 2002).

One curious finding from Study 2 was that the MHC clients' subsequent use of mental health services is independent of the court's expressed expectations about treatment, as reflected in the treatment-linkage strategies coded in Study 1. As Table 3 revealed, defendants whose transcripts contained no explicit discussion of treatment-linkage were not statistically less likely than others to access some type of mental health service during follow-up. A precise explanation for this unexpected finding cannot be determined from our data, although a number of factors may come into play here. First, transcripts simply may not tell the whole story regarding the Broward MHC process. While the court stenographer's version of the hearing is probably the best record available, it is clear from observing the court that not everything gets captured in the transcript. The relaxed procedure in the mental health court (e.g., witnesses are neither called nor sworn; speaking order is not controlled) sometimes result in several individuals talking at once or several conversations going on simultaneously, and the court reporter cannot monitor all of them simultaneously. Further, there are often private conversations between the defendant and other court participants, including the public defender or mental health consultants, in which treatment-related information (or exhortation) may be communicated.

Second, some of the participants in our study may have previously been to the court, with their mental health histories already known to the judge or other participants at the hearing for which we obtained a transcript. It is possible that in some instances implicit expectations about treatment rather than explicit ones were communicated to the defendant, or that communication occurred in conversations (e.g., with defense counsel or treatment staff) outside of the court hearing as reflected in the transcript. Third, although the court has limited staff resources for the active monitoring of clients' involvement in treatment, some defendants whose transcripts were bereft of treatment-linkage information may have been aided in accessing treatment by the efforts of support staff. Fourth, these findings may reflect a judgment by the court that certain clients had the ability and the means to autonomously pursue treatment.

If there is one potentially troubling finding from the study of MHC transcripts, it is that there is probably considerably less explicit discussion and resolution of the ''voluntary participation'' issue than legal purists would find desirable. In only 15.7% of transcripts was this issue explicitly discussed, though a little more than half (53.7%) of the clients selfreported during the enrollment interview that they knew that participation in the court was voluntary. This awareness may have come from attending to the judge's general statements about the nature of the court[8]; in addition, some may have been apprised of their legal choices in conversations with their public defender. Nevertheless, this is an issue of some importance that can, and arguably should, be handled on the record in each case individually.

It is also reasonable to ask whether other strategies not used by the Broward Court would affect entry into and retention in treatment. For example, what would be the impact of the use of punishment for noncompliance with treatment? What if the court retained jurisdiction in a higher percentage of cases, or required subsequent status hearings as a matter of course? Should a MHC retain staff that assure that treatment orders are followed up, or should that

responsibility be vested elsewhere, for example, in the treatment provider or in probation staff? Does the choice of strategy matter in terms of treatment? In addition, while the court has available client specific information regarding mental health needs and treatment options, neither the transcripts nor our observations suggest that such material is made available to the court in systematic fashion. Would more formal presentation of such information have an impact on judicial decision making, or does the informal nature of the court facilitate its work? These questions, while important, also assume of course that treatment is available.

Our findings suggest that the Broward Mental Health Court operates in a manner consistent with its stated mission as a treatment court. They also suggest that at least in comparison to a traditional misdemeanor court, the Broward County MHC enhances treatment access and involvement for a substantial number of defendants appearing before it. While the jury is still out regarding the impact of this treatment on defendants' mental health status, or whether it reduces the likelihood of re-arrest and return to jail, most will likely agree that gaining access to treatment is a necessary if not sufficient condition for attaining these ultimate goals.

## Acknowledgements

This research was supported by grants from the John D. and Catherine T. MacArthur Foundation and the Florida Legislature. We appreciate the comments and suggestions provided by John Monahan, Marvin Swartz, and Henry Steadman, who reviewed an earlier draft of this paper.

## References

Cohen, J. (1977). Statistical power analysis for the behavioral sciences. (Revised ed.). Hillsdale, NJ: Lawrence Erlbaum Associates.

Department of Health and Human Services (1999). Mental health: a report of the surgeon general. Rockville, MD: Author.

Goldkamp, J. S., & Irons-Guynn, C. (2000). Emerging judicial strategies for the mentally ill in the criminal caseload. Mental health courts in Fort Lauderdale, Seattle, San Bernadino, and Anchorage. Philadelphia, PA: Crime and Justice Research Institute (http://www.ncjrs.org/html/bja/mentalhealth/contents.html).

Hora, P. F., Schma, W. G., & Rosenthal, J. T. (1999). Therapeutic jurisprudence and the drug treatment court movement: revolutionizing the criminal justice system's response to drug abuse and crime in America. Notre Dame Law Review, 74, 439–537.

McGaha, A., Boothroyd, R. A., Poythress, N. G., Petrila, J., & Ort, R. G. (2002). Lessons from the Broward County mental health court evaluation. Program Planning and Evaluation, 25, 125–135.

Petrila, J. (2003). An introduction to special jurisdiction courts. International Journal of Law and Psychiatry (this issue).

Petrila, J., Poythress, N., McGaha, A., & Boothroyd, R. (2001, Winter). Preliminary observations from an evaluation of the Broward County Florida Mental Health Court. Court Review, 14–22.

Poythress, N., Bonnie, R. J., Hoge, S. K., Monahan, J., & Oberlander, L. B. (1994). Client abilities to assist counsel and make decisions in criminal cases: findings from three studies. Law and Human Behavior, 18, 435–450.

Poythress, N. G., Petrila, J., McGaha, A., & Boothroyd, R. (2002). Perceived coercion and procedural justice in the Broward County Mental Health Court. International Journal of Law and Psychiatry, 25, 517–533.

Rabaska, L. (2000). A court that sentences psychological care rather than jail time. Monitor on Psychology, 31(7), 58–60.

Steadman, H. J., Davidson, S., & Brown, C. (2001). Mental health courts: their promise and unanswered questions. Psychiatric Services, 52, 457–458.

Stiles, P., Boothroyd, R. A., Snyder, K., & Zong, X. (2002). Service penetration by persons with severe mental illness: how should it be measured? Journal of Behavioral Health Services, 29, 198–207.

Watson, A., Luchins, D., & Hanrahan, P. (2001). Mental health court: promises and limitations. Journal of the American Academy of Psychiatry and Law, 28, 476–482.

Wexler, D. B., & Winick, B. J. (1991). Essays in therapeutic jurisprudence. Durham, NC: Carolina Academic Press.

Woerner, M. G., Mannuzza, S., & Kane, J. M. (1988). Anchoring the BPRS: an aid to improved reliability. Psychopharmacology Bulletin, 24, 112–118.

Wren, G. L. (1998). Progress Report: July 1997–June 1998, The Nation's First Mental Health Court. Fort Lauderdale, FL.

Filename:            The_Broward_Mental_Health_Court_process (1)
Directory:           C:\Users\willf\OneDrive
Template:
                     C:\Users\willf\AppData\Local\Packages\Microsoft.Office.Desktop_8wek
        yb3d8bbwe\LocalCache\Roaming\Microsoft\Templates\Normal.dotm
Title:               PII: S0160-2527(02)00203-0
Subject:
Author:
Keywords:
Comments:
Creation Date:       8/18/2019 10:51:00 AM
Change Number:       1
Last Saved On:       8/18/2019 10:51:00 AM
Last Saved By:
Total Editing Time:  0 Minutes
Last Printed On:     8/18/2019 10:53:00 AM
As of Last Complete Printing
    Number of Pages:    17
    Number of Words:    7,392 (approx.)
    Number of Characters:        42,139 (approx.)



**Pergamon**

International Journal of Law and Psychiatry
25 (2002) 517–533



# Perceived coercion and procedural justice in the Broward mental health court

Norman G. Poythress*, John Petrila, Annette McGaha, Roger Boothroyd

*Department of Mental Health Law and Policy, University of South Florida, 13301 Bruce B. Downs Boulevard, Tampa, FL 33612-3899, USA*

## 1. Introduction

### 1.1. The rise of mental health courts

Approximately 700,000 people with major mental disorder enter United States jails each year (U.S. Department of Justice, 1999), many of whom are arrested repeatedly for minor felonies and misdemeanors. It is increasingly assumed that their mental disorder and attendant difficulties accessing clinical services and social support programs contribute to this pattern of repeated contact with the criminal justice system. This in turn frustrates the efficiency concerns of the criminal justice system because of the extensive resources consumed by repeatedly booking, jailing, and attempting to treat these individuals in the jail setting. It also frustrates therapeutic objectives because these individuals may become increasingly distant and disengaged from their families and from community-based mental health services.

The most recent innovation to address this problem has come in the form of specialty courts called mental health courts. Based somewhat on the drug court model, mental health courts vary in terms of point of intervention (e.g., pre- versus postadjudication), eligibility requirements (most are limited people with mental illness charged with nonviolent misdemeanors), the use of sanctions, and in other particulars (see Goldkamp & Irons-Guynn, 2000). However, all appear to have as a primary goal interrupting the cycle of repeat offending and incarceration through the expeditious processing of defendants with mental illness, providing access to treatment and social supports, and assuring public safety (Lerner-Wren, 2000).

To date no mental health court has been evaluated systematically to determine its efficacy and outcomes. We are currently involved in a 2-year evaluation of the Broward County

---

* Corresponding author. Tel.: +1-813-974-9306; fax: +1-813-974-9327.
  *E-mail address*: poythres@mirage.fmhi.usf.edu (N.G. Poythress).

0160-2527/02/$ – see front matter © 2002 Elsevier Science Inc. All rights reserved.
PII: S0160-2527(01)00110-8

mental health court in Ft. Lauderdale, Florida, which became operational in June 1997 and was the first mental health court in the country. Our evaluation is multifaceted (see Petrila, Poythress, McGaha, & Boothroyd, 2001) and will eventually yield information on treatment involvement, community adjustment, criminal recidivism, quality of life and other outcomes. Many of the study outcomes relate to efficiency and efficacy issues and the findings will not be available until the follow-up interviews and analyses are completed. However, the court also has an explicit philosophy that directs its mission and specific aspirations regarding the impact of the mental health court process on defendants and the role of the court vis-a-vis that of the client in taking ultimate responsibility for treatment involvement and therapeutic gain. In this regard, defendants' subjective experiences in terms of perceived coercion, procedural justice, and the emotional impact of mental health court involvement become important concerns in their own right as well as factors that may ultimately mediate other outcomes. In this paper, we describe findings regarding these issues.

*1.2. The Broward County Florida mental health court*

The Broward County mental health court (hereafter, MHC) was established by administrative order of the chief judge of the 17th Florida Judicial Circuit on June 6, 1997.[1] The court's jurisdiction is limited in general to nonviolent misdemeanants. Individuals charged with assault may come before the court with the victim's consent. The court employs no formal diagnostic screens to determine whether to accept jurisdiction; rather, a history of mental illness or mental health treatment, or apparent symptoms when the person comes before the court, may result in a decision by the court to take jurisdiction. According to a report on the court's operation, diagnoses of these individuals at the time of their appearance before the MHC included schizophrenia (18%); depression (10%); dual diagnoses of mental illness and substance or alcohol abuse (29%); bipolar disorders (13%); mental retardation (2%); and unknown (20%) (Second Year Progress Report, 1999).

Referral of a defendant to the court may come at any time or from any point in the criminal justice system, though magistrates conducting initial hearings make most referrals. The MHC generally conducts a jurisdictional hearing within 24 hours (and often sooner) from referral. Treatment staff from local mental health agencies are commonly present at the court, and the lawyers for the state and the defendant play very limited roles. If the court accepts jurisdiction, in most cases it will attempt to arrange treatment for the individual, and in many cases will conduct periodic status hearings to determine how the person is faring.

*1.3. Therapeutic jurisprudence: legal philosophy guiding the Broward mental health court*

Law professor David Wexler coined the term "therapeutic jurisprudence" to describe the view that the therapeutic consequences of legal action may be affected by variations

---

[1] Circuit Court of the Seventeenth Judicial Circuit, Broward County, Florida, *In Re: Creation of a Mental Health Court Subdivision Within the County Criminal Division*, Administrative Order No. VI-97-I-1A.

or interpretations in substantive rules, legal procedures, and in the roles of lawyers and judges (Wexler, 1990; Wexler & Winick, 1991). The Broward MHC "wholly adopts and applies the principles of Therapeutic Jurisprudence" (Lerner-Wren, 2000, p. 19) and has abandoned much of the "formal lawyering" and other stylistic aspects of a traditional adversarial forum in favor of methods designed to "advance the Court's role as an active therapeutic agent in the recovery process" (Lerner-Wren, 2000, p. 19; see also: Goldkamp & Irons-Guynn, 2000). Within this framework, the court hopes to reduce the stigma of mental illness, enhance defendants' autonomy, and promote "the assumption of personal responsibility and personal empowerment of the Court participant" (Lerner-Wren, 2000, p. 19). Both the actions and the aspirations of the MHC imply that reducing defendants' sense of coercion and enhancing their perceptions of procedural justice are important intermediate goals.

## 1.4. Coercion in court-ordered mental health services

The definition of "coercion" in mental health has received much attention and debate (Wertheimer, 1993). The crux of the debate, often in the context of civil commitment, is whether psychiatric and psychological treatment must be voluntary in order to work (see e.g., Group for the Advancement of Psychiatry, 1994; Stone, 1975). Early studies focused on patients' official legal status (involuntarily committed or not) as an objective indicator of coercion, although more recently consumers' subjective experience of the process of entering treatment has emerged as a critical outcome variable (Monahan et al., 1999). This assumes that "Coercion exists on a continuum,... Mental health commitment and other court-ordered treatment is thus just the extreme end of the spectrum of pressures or restrictions that make up coercion" (Diamond, 1996, p. 55). The research summarized in Table 1 suggests that there may be a positive relationship between the degree to which psychiatric treatment is (objectively) legally compelled and the extent to which consumers experienced coercion in the treatment that they receive. However, most investigators note the considerable variation in perceived coercion within groups and caution against inferring too strongly any individual patient's level of perceived coercion from official legal status.

In the Broward County MHC, a defendant who agrees to the court's jurisdiction is usually referred to community mental health services. The law considers such treatment *voluntary* because the defendant has the legal right to opt out of MHC in favor of a regular misdemeanor court disposition. In light of this formal voluntary status and the MHC's goal that its clients become autonomous participants in their mental health care, our hypothesis for this study was that defendants would report relatively low levels of perceived coercion in MHC, comparable perhaps to the levels reported by patients receiving voluntary outpatient services in other studies (Table 1). However, some studies of civil commitment note that some patients report being unaware of the voluntary or involuntary nature of their hospitalizations even immediately after their hearings were concluded. We also considered, therefore, that some defendants might not be fully aware of the "voluntary" nature of their involvement in the MHC (and subsequent court-facilitated treatment). Thus, our second hypothesis was that defendants who reported being unaware of a clear legal choice about remaining in the

520        N.G. Poythress et al. / International Journal of Law and Psychiatry 25 (2002) 517–533

Table 1
Perceived coercion in various mental health populations

| | Study site | $N$ | Perceived coercion[a] mean (S.D.) |
|---|---|---|---|
| *Involuntary psychiatric inpatients* | | | |
| Hiday, Swartz, Swanson, and Wagner (1997) | US | 331 | 2.9[b] |
| Hoge et al. (1997) | US | 66 | 3.27 (2.16) |
| Cascardi et al. (1997)[c] | US | 60 | 3.68 (1.76) |
| McKenna, Simpson, and Laidlaw (1999) | New Zealand | 69 | 3.4 (1.7) |
| Poulsen (1999) | Denmark | 47 | 3.5 (1.4) |
| *Quasi-voluntary psychiatric inpatients*[d] | | | |
| Cascardi et al. (1997)[c] | US | 60 | 2.35 (1.79) |
| Poulsen (1999) | Denmark | 48 | 2.1 (1.5) |
| *Involuntary psychiatric outpatients* | | | |
| Swartz et al. (1999) | US | 123 | 2.1[b] |
| *Voluntary psychiatric inpatients* | | | |
| Hoge et al. (1997) | US | 91 | 0.64 (1.07) |
| McKenna et al. (1999) | New Zealand | 69 | 1.9 (1.8) |
| Poulsen (1999) | Denmark | 48 | 1.7 (1.5) |
| *Voluntary psychiatric outpatients* | | | |
| Swartz et al. (1999) | US | 129 | 1.3[b] |

[a] All studies use one of two metrically equivalent measures of perceived coercion developed by Gardner et al. (1993). Possible mean scores range from 0 (*low*) to 5 (*high* perceived coercion).

[b] Standard deviation not reported.

[c] Data from Cascardi et al. (1997) were recoded for this analysis.

[d] In Cascardi et al. (1997), patients *involuntarily admitted for a psychiatric evaluation to determine whether* they met civil commitment criteria were subsequently permitted to sign into the facility on a "voluntary" basis. In Poulsen (1999) these patients had come into the hospital on a voluntary basis but were then detained by staff when they attempted to leave the facility.

jurisdiction of the MHC would report greater perceived coercion than defendants who were explicitly aware of their full range of options.

*1.5. Procedural justice implications for mental health court*

Procedural justice provides another perspective from which to view MHC and its potential impact on defendants served by the court. Procedural justice focuses on participants' subjective experience of the case disposition *process*. Research in a variety of conflict resolution contexts suggests that perceived fairness of the process is perhaps the most critical determinant of procedural justice. Key factors that affect perceived fairness include (1) voice (having one's own side of the dispute presented to and heard by the decision maker) and (2) being treated with respect and dignity by the authoritative decision maker (Lind & Tyler, 1988; Tyler, 1992).

Tyler (1992) hypothesized that in the context of court-ordered psychiatric treatment enhanced perceptions of procedural justice would be "... likely to facilitate the subsequent therapeutic process" (p. 439). While there has been very little empirical research to explore this hypothesis, at least two studies have concluded that individuals who have been subject to involuntary civil commitment hearings could discern procedural justice attributes in such hearings (Cascardi, Poythress & Hall, 2001; Greer, O'Regan, & Traverso, 1996).

It is clear that the Broward MHC aspires to facilitate positive procedural justice features. We have observed, as did Goldkamp and Irons-Guynn (2000), that

> ... the Broward Court was designed to be informal, often involving interaction and dialogue between the judge and the participant about problems and treatment options.... The ... Court [has] a respectful and helpful manner toward participants ... [and] ... adopts a supportive, instructive, problem-solving and understanding style ... designed to ... contribute to the improved mental health of its participants.... The patience and tolerance for the problems of comprehension and communication that defendants may have create an impression that speedy disposition of a large number of cases is not necessarily high priority. (pp. 23–24)

In contrast, our observations of the comparison court (a court of similar jurisdiction in a county chosen for its similarities to Broward County) suggest that such features are largely absent. Hearings are conducted by remote video, the judge and attorneys do most of the talking, and the implicit (if not explicit) agenda appears to be quick resolution of the charges, often through a plea agreement that is offered by the judge and agreed to by counsel, and defendants usually are not encouraged to speak except in response to plea offerings.

Against a null hypothesis of no differences in perceived procedural justice (PPJ) between these two courts, our alternative hypothesis was that mean scores on measures of PPJ would be higher for MHC defendants. Further, we predicted that both perceived coercion and procedural justice factors would predict clients' ratings of satisfaction with the outcome of their court hearings.

### 1.6. Emotional impact of court hearings

The expectation that MHC clients might have more positive emotional reactions to their hearings is derived from the considerations above regarding coercion and procedural justice. In MHC defendants become engaged in a dialogue with a highly respected authority who speaks to them in a respectful manner, offers a potentially better future through a court-monitored regime of mental health services (that often includes exploring for clients' benefits and entitlements), and places their criminal charge in abeyance with the (often explicit) prospect of no formal adjudication or, at least, no formal legal sanction. In contrast, defendants are relatively passive participants in the traditional misdemeanor court, which appears to have a clear agenda of rapid case disposition. Thus, against a null hypothesis of no differences, our alternative hypothesis was that more positive emotional reactions to the court hearing would be reported by defendants in the

MHC. Further, we hypothesized that the participants' emotional reactions to their hearings would be explained by perceived coercion, outcome satisfaction, and procedural justice factors; our hypothesis was that participants reporting less perceived coercion, greater satisfaction, and greater perceived fairness would report more positive emotional reactions to their court hearings.

## 2. Method

### 2.1. Participants

The MHC sample ($n = 121$) consisted of English-speaking defendants of either gender, between the ages of 18 and 64, whose cases were accepted by the MHC between December 1, 1999 and April 30, 2001. MHC jurisdiction depends on judicial findings that the individual (a) is charged with a nonviolent misdemeanor, ordinance violation, or criminal traffic offense;[2] (b) currently has, or previously has had, mental health problems;[3] (c) is able and willing to make a voluntary choice to have the case disposed in the MHC; and (d) would not pose significant public safety concerns. Individuals not meeting all of these criteria are returned to a regular misdemeanor court for disposition of their cases.

Our comparison group included 101 defendants from another county in Florida that does not have an MHC but who met the criteria (a) and (b) above for MHC jurisdiction in Broward County. Each currently had, or reported a history of, mental health problems.[4] To minimize the chance that clinical and demographic variables would be confounded with site differences in this study, our design called for the MHC and comparison samples to be matched on certain demographic variables (age, gender, race) and on current mental status. Thus, the recruitment in the comparison county lagged recruitment in the Broward

---

[2] Individuals charged with misdemeanor battery offenses may be accepted into MHC if the victim in the case agrees to this route of disposition. The Broward MHC does not accept persons charged with domestic violence or driving while intoxicated charges.

[3] Mental health screening is conducted in court or just prior to court by mental health professionals who work with the court or graduate students in clinical psychology from Nova Southeastern University working under supervision (Rabasca, 2000). However, the court may accept jurisdiction in the absence of formal diagnostic findings.

[4] In the comparison county, defendants with mental health issues were not automatically identified by the fact of their referral to/acceptance by an MHC. Thus, in this county our research assistants conducted brief mental health screening interviews in the jail with individuals who otherwise (e.g., appropriate type of offense; age and English-speaking criteria) met inclusion criteria. The screening questions asked: (1) Have you ever been treated for a mental health problem? (2) Have you ever been to a mental health center or psychiatric hospital for problems with your nerves, or have you ever had a case manager? (3) Have you ever had thoughts of hurting yourself or have you tried to hurt yourself? (4) Do you take now, or have you ever taken, medication for nerves (psychiatric medication)?

MHC in order to permit selection of comparison clients whose demographic and clinical features matched those of the Broward sample.

## 2.2. Measures

Basic demographic information was obtained from each participant by self-report. Other measures described here are part of a more extensive protocol used in our comprehensive evaluation of the MHC.

### 2.2.1. Perceived coercion

The MacArthur Perceived Coercion Scale (MPCS) is a 5-item measure derived from the MacArthur Admission Experience Interview (AEI: Gardner et al., 1993, p. 310). It was designed to assess perceived coercion associated with the process of hospital admission. The MPCS queries about (1) factors (e.g., "Mostly what I wanted. ... Mostly what other people wanted") that *influence* the outcome (going into the hospital), (2) perceived *control* ("How much control did you have ...?") over the outcome, (3) perceived *choice* in the outcome, (4) perceived *freedom* to accept or reject the outcome, and (5) perceived initiative ("Whose idea was it ...? [Mostly mine ... Mostly someone else's]") to go into the hospital. Participants select from an array of categorical responses for each item and these responses are quantified using a scoring scheme provided by Gardner et al. (1993, Table 6, p. 319). Total MPCS scores range from 0 (*low*) to 5 (*high* perceived coercion) and are reliable over brief intervals ($r=.72$, 12- to 24-hour retest), although stability is lower for individuals with severe psychotic symptoms (Cascardi, Poythress, & Ritterband, 1997). Because the MPCS was originally worded to assess perceptions of coercion in involuntary hospitalization, modifications in the items' wording was necessary for this study so that items referenced participation in MHC as the relevant outcome.[5] Because defendants in the comparison court did not have a choice about venue for disposing their cases, this measure was administered only to participants from the MHC.

### 2.2.2. Perceived procedural justice

A 5-item PPJ measure, similar to that used by Cascardi et al. (2001), was used to solicit participants' perceptions of the procedural justice features of their court hearings. Participants rated from 1 (*not at all*) to 7 (*definitely*) the degree to which (1) they had an opportunity to tell the judge information about their personal and legal situation (voice), (2) the judge seemed genuinely interested in them as a person, (3) the judge treated them with respect, (4) the judge treated them fairly, and (5) they were satisfied with how the judge treated them and dealt with their case. One additional Likert item, scored from 1 (*not at all*) to 7 (*definitely*), solicited participants' rating on the question "Are you satisfied with the decisions made about your

---

[5] A copy of the modified MPCS is available from the authors.

case today?" (see Table 3). This item served as an index of defendants' satisfaction with the outcomes of their hearings.

## 2.3. Impact of hearing

A 6-item impact of hearing (IOH) measure solicited participants' ratings about how they felt as a result of being in court. On a scale ranging from 1 to 7, participants indicated whether they felt (1) worse or better, (2) upset versus calm, (3) less respected versus more respected, (4) confused versus informed, (5) less hopeful versus more hopeful, and (6) good or bad (globally) in comparison to how they felt prior to court (see Table 4).

### 2.3.1. Mental status

The anchored version of the Brief Psychiatric Rating Scale (BPRS-A: Woerner, Mannuzza, & Kane, 1988) was used to assess current mental status. The BPRS-A involves a brief interview (about 15 minutes) that inquires about recent ("the past week or two") symptoms (e.g., anxiety, hostility, suspiciousness, etc.). Ratings of symptom severity for each of 18 items are made on the basis of observations and interview responses and these ratings are summed to yield a global index of current psychopathology. The BPRS has been used extensively in psychiatric research and in most studies reliability for the total pathology score exceeds 0.80, while median reliability for individual symptom ratings is about 0.75 (Gabbard et al., 1987).

## 2.4. Procedures

At each site, prospective participants were approached by trained research assistants who attended the court hearings and identified individuals who appeared to meet study criteria. Where possible an attempt was made to approach these individuals on the day of their hearing, but in no case any longer than 1 week after their hearing date. Written informed consent was obtained from each participant using procedures approved by the University of South Florida Institutional Review Board. In addition to the research assistant making a judgment regarding the participant's competence to consent to research, a brief (5 items) multiple-choice "test" of consent disclosure comprehension was administered to each prospective participant and only those who answered correctly three or more items were allowed to enroll in the study. As noted above (footnote 6), with defendants at the comparison site for whom no information was available regarding current or prior psychiatric problems, the research assistants also conducted a brief screening interview to determine that the defendant had current or prior mental health problems comparable to those that would likely provide an sufficient basis for acceptance into MHC.

The research protocol was administered on a one-to-one basis at a place convenient for the defendant. In some instances, the protocol was administered in an empty jury room adjacent to the court, in other instances at a place in the community (e.g., defendant's home, fast food restaurant). Some defendants not yet released from custody completed the protocol in the jail. Within the larger research protocol, the order of administration of the research

measures described here was demographics/social history interview, MPCS (MHC participants only), PPJ, IOH, and BPRS-A. Each participant received twenty dollars upon completion of the protocol.

## 3. Results

### 3.1. Sample description

Table 2 presents demographic and clinical features of the MHC and comparison site samples. These data indicate that our efforts to obtain matched samples have been highly successful. The mean ages of the two groups are comparable and the samples contain approximately the same proportions of defendants by primary racial groups, $\chi^2(1) = 1.93$, n.s. The MHC sample contains a slightly higher percentage of male participants than the comparison sample, although this difference is not statistically significant, $\chi^2(1) = 2.03$, n.s. In terms of marital status (not a matching variable), equal percentages of participants from both groups report being married currently; a somewhat higher percentage of comparison sample participants, 62.4% vs. 43%, $\chi^2(1) = 8.30$, $P < .005$, reports ever being married.

Table 2
Demographic and clinical characteristics of the mental health court and comparison samples

| | Broward mental health court sample ($n = 121$) | Comparison sample ($n = 101$) |
|---|---|---|
| *Demographics* | | |
| Age ($M$, S.D.) | 38.04 (10.64) | 37.98 (9.62) |
| Gender ($N$, %) | | |
|   Male | 83 (68.6%) | 60 (59.4%) |
| Race ($N$, %) | | |
|   African American | 29 (24%) | 27 (26.7%) |
|   Caucasian | 80 (66.1%) | 57 (56.4%) |
| Marital status ($N$, %) | | |
|   Currently married | 7 (5.8%) | 6 (5.9%) |
|   Ever married[a] | 52 (43%) | 63 (62.4%) |
|   Never married | 68 (56.2%) | 38 (37.6%) |
| *Current mental status (M, S.D.)* | | |
| Brief Psychiatric Rating Scale | | |
|   Total Score | 34.42 (9.90) | 34.21 (7.88) |
|   Psychoticism subscale | 4.89 (2.61) | 4.23 (2.24) |
|   Depression subscale | 8.91 (4.42) | 10.96 (4.12) |
|   Hostility subscale | 5.51 (2.43) | 4.72 (2.04) |
|   Emotional Withdrawal subscale | 4.41 (2.37) | 4.59 (2.37) |

[a] Includes "currently married" category.

The groups are also highly similar in terms of global psychopathology as means scores between the groups for the BPRS-A Total do not differ significantly. There are statistically significant differences between the groups for three BPRS-A subscales, however. Mean scores for the Broward MHC sample are higher for psychotic features, $t(218) = 2.00$, $P < .05$, and hostility, $t(219) = 2.59$, $P < .01$, but lower on the depression subscale, $t(218) = -3.53$, $P = .001$.

## 3.2. Perceived coercion

Full MPCS data were available for 93 of the 121 MHC participants.[6] The mean MPCS score for the sample was 0.69 (S.D. = 1.30). MPCS scores can range from 0 to 5, and lower scores reflect greater perceived autonomy, control, choice, and freedom. Thus, the overall sample mean suggests that defendants in MHC perceive relatively little coercion in the decision to have their case disposed in MHC, which is usually tantamount to agreeing to continue or to enter community-based mental health treatment and to have that treatment monitored by the court.

We considered that one factor that might influence participants' perceptions of coercion was their explicit awareness of a choice about MHC participation. Therefore, this sample of 93 participants was split according to their response to the protocol question: "Either during your court hearing or before the hearing, did anyone explain to you that you could choose to have your case kept in the mental health court or that you could have your case transferred back to a regular misdemeanor court?" Thirty-two participants reported that they were UNAWARE of this option, while 61 participants reported that they were AWARE of the option.[7] A comparison of mean MPCS scores for these subgroups revealed that the mean score for the AWARE group ($M = 0.20$, S.D. = 0.71) was statistically different from that of the UNAWARE group ($M = 1.67$, S.D. = 1.64), $t(37.17) = 4.85$, $P < .001$.[8]

One potential alternative explanation for this difference was that the UNAWARE groups may have been more severely ill than the AWARE group and therefore less able to comprehend or appreciate that a choice about remaining in MHC was available to them. To explore this explanation the scores of these two groups on the BPRS were compared; there were no statistically significant differences between these groups on the BPRS-A Total score or on any of the BPRS-A subscales (psychoticism, depression, hostility, emotional withdrawal).

---

[6] For 17 participants, research assistants inappropriately failed to administer the MPCS. Six remaining participants were dropped from analyses due to one or more items of missing data.

[7] Our observations reveal that on many (but not all) days the judge explains this option, either to the group of defendants as a whole or in the course of discussing a particular individual's case (which discussion can be heard by the other defendants). The option may also be communicated to defendants privately (e.g., by the mental health screening staff or by the public defenders). Thus, we do not know in every case what any particular defendant was told about this option and our analysis is based on what defendants reported that they were (or were not) told.

[8] Degrees of freedom adjusted due to unequal variances in the two groups.

### 3.3. Perceived procedural justice

The 5 items that solicited participants' ratings on PPJ dimensions (Items 1–5) and the item for rating satisfaction with hearing outcome (Item #6) are presented in Table 3, along with the mean scores and standard deviations for each group. Multivariate analysis of variance (MANOVA) revealed that there were statistically significant differences between the groups on these items, Wilks $\lambda = 0.371$, $F(6,213) = 60.20$, $P < .001$. Univariate analyses revealed that, for each item, the MHC was rated higher than was the conventional misdemeanor court, $Fs(1, 220)$ range 115 to 333.69, all $Ps < .001$.

As Table 3 reveals, participants in the conventional misdemeanor court rated only one procedural justice dimension—being treated respectfully by the judge—at least as high as "somewhat" present ($M = 4.28$). The opportunity for "voice" (Item #1) and the sense that the judge was interested in the defendant as an individual (Item #2) were perceived as largely absent in regular misdemeanor court proceedings, with mean ratings (1.80, 1.95) near the bottom of the rating dimension. In contrast, all procedural justice features were rated higher than "somewhat" present by the MHC participants and toward the "definitely" present end of the scale; the highest ratings were assigned to items that represent the perception of fair ($M = 6.55$) and respectful ($M = 6.57$) treatment by the MHC judge.

### 3.4. Predictors of satisfaction with hearing outcomes

We had hypothesized that outcome satisfaction (Table 3, Item #6) would be explained by a combination of perceived coercion and procedural justice variables. A preliminary examina-

Table 3

Perceived procedural justice in mental health court versus conventional misdemeanor court

| Procedural justice item | Mental health court mean (S.D.) | Comparison court mean (S.D.) |
| --- | --- | --- |
| 1. At court today, did you have enough opportunity to tell the judge what you think he/she needed to hear about your personal and legal situation? ("voice") | 5.39 (2.15) | 1.80 (1.82) |
| 2. At court today, did the judge seem genuinely interested in you as a person? | 6.12 (1.59) | 1.95 (1.80) |
| 3. At court today, did the judge treat you respectfully? | 6.57 (0.99) | 4.28 (2.08) |
| 4. At court today, did the judge treat you fairly? | 6.55 (1.08) | 3.78 (2.34) |
| 5. Are you satisfied with how the judge treated you and dealt with your case today? | 6.45 (1.38) | 3.12 (2.47) |
| *Outcome satisfaction* | | |
| 6. Are you satisfied with the decisions made about your case today? | 6.28 (1.37) | 3.39 (2.48) |

Each item rated on a 7-point scale with anchors at 1 (*not at all*), 4 (*somewhat*), and 7 (*definitely*).

Group means on all items are statistically different at $P < .001$.

tion of correlations among these variables for the mental health group, however, revealed that MPCS was not statistically associated with outcome satisfaction ($r$=.01, n.s.). Therefore, we used procedural justice Items 1 through 4 as predictors in a multiple regression analysis to determine the best predictors of outcome satisfaction in the combined samples.[9] The regression program in SPSS 10.0 for Windows was used to conduct the analysis, and the Backward removal method was used to select variables. In this method, each predictor was forced into the regression equation last in order to determine the unique variance explained by that predictor. In successive iterations, variables that did not contribute independent variance were deleted, effectively redistributing shared variance to the remaining predictors. The analysis ends when none of the remaining predictor variables can be deleted because each explains independent variance in the dependent variable. Results from this analysis revealed that outcome satisfaction was best explained by three procedural justice variables, voice (Item #1), person (Item #2) and fairness (Item #4). Together these variables explained 63% of the variance in outcome satisfaction, $R$=.790, $F(3,216)$=119.85, $P$<.001.

## 3.5. Impact of hearing

The 6 items that solicited participants' ratings of the emotional impact that the court hearing had on them are presented in Table 4, along with the mean scores and standard deviations for each group. Multivariate analysis of variance (MANOVA) revealed that there were statistically significant differences between the groups on these items, Wilks $\lambda$=0.621, $F(6,211)$=21.51, $P$<.001. Univariate analyses revealed that, for each item, MHC participants rated their hearings as having a more positive emotional impact than did participants in the conventional misdemeanor court, $Fs(1,217)$ range 57.99 to 88.36, all $Ps$<.001.

As Table 4 reveals, for participants in the conventional misdemeanor court mean scores on all items were at, or less than one scale point below, anchored Point #4 ("no different") on the response scale; these ratings indicate that these defendants emerged from their hearing feeling no different, or perhaps slightly worse, than they had felt prior to their hearings. In contrast, MHC clients reported uniformly positive emotional effects from their hearings. All items' mean ratings were more than 1.5 scale points above #4 ("no different"), with the most positive emotional impacts being feeling more hopeful ($M$=5.99), more calm ($M$=6.06) and better (6.07) than they felt prior to their hearings.

## 3.6. Predictors of impact of hearing

We had hypothesized that IOH would be explained by a combination of perceived coercion, outcome satisfaction, and procedural justice variables. To test this hypothesis a total IOH score was computed by adding the ratings for IOH Items 1–6. A preliminary

---

[9] PPJ item #5 was excluded from this analysis because its wording includes "satisfaction" and it appears to be somewhat redundant with the outcome variable (item #6). + The correlation between these two items was 0.82 and statistically significant ($P$<.01).

into psychiatric treatment, MHC appears to be experienced as considerably less coercive than other legal routes that have been studied. The low level of perceived coercion reported in this context is particularly interesting in light of findings reported by Lidz et al. (1998) that higher perceived coercion was associated in particular with negative pressures such as threats and formal legal coercion; virtually all of the MHC participants in this study had been arrested and jailed within the 72-hour period preceding their appearance in the court.

Although perceived coercion appeared generally low across the MHC sample, the results also suggest that making explicit to defendants that they have a choice whether to remain in MHC may further reduce perceived coercion. As noted above (see footnote 7) defendants may be advised that they have this choice by any of several courtroom participants. We have observed the judge on many occasions to address all of the defendants present about this issue at the outset of court, although on other occasions such a general statement is not made. Clinical staff conducting screening interviews or public defenders talking privately with their clients may also broach this issue with the defendants. When the judge decides to accept a client into the court, we have observed that there is sometimes an explicit statement made that the defendant has assented to a MHC disposition, although the determination that a choice has been made sometimes appears to be more implicit. Our results suggest that perceived coercion in MHC may be minimized if it is made explicit to clients that they have a choice in this regard.

At the same time, the fact that a number of defendants reported that they were unaware that they had a choice regarding their participation in the court raises important issues. A central tenet of therapeutic jurisprudence is that in at least some circumstances the role of counsel must become markedly less adversarial; David Wexler for example has argued that the law can become therapeutic only if the "culture of critique" that he believes characterizes the law's usual approach to issues can be replaced (Wexler, 1999). It has also been argued that in a specialty court, for example, a drug court, that lawyers must adopt a nonadversarial role for such courts to work (Kaye, 1998). Others, however, have argued that the adoption of a nonadversarial role in a specialty court such as a drug court is unwarranted because defendant rights and potential punishment are at issue (Boldt, 1998).

Regardless of one's views on the role of counsel, all would presumably agree that defendants should be permitted to enter a special court's jurisdiction only with knowledge that a choice was available; the importance of choice is perhaps even more critical when a court's philosophy is premised on the voluntary agreement to pursue treatment. This suggests that as MHCs develop, particular attention should be paid to assuring that individuals are informed when deciding to enter the court's jurisdiction, not only because of a philosophic commitment to voluntary treatment but because agreement to participate in the court may often mean the waiver of speedy trial and other rights available in a criminal context.

The MHC has made a number of procedural adaptations in its effort to have the courtroom experience be one that potentially reduces stigma and contributes as an "active therapeutic agent in the recovery process" (Lerner-Wren, 2000, p. 19). Our findings suggest that these adaptations have resulted in the kinds of procedural justice enhancements that theory suggests might ultimately be beneficial to therapeutic outcomes. On all procedural justice dimensions, including those that relate to critical factors such as voice, respectful treatment by authority,

*N.G. Poythress et al. / International Journal of Law and Psychiatry 25 (2002) 517–533*   531

and fairness, MHC received significantly higher ratings than did conventional misdemeanor court. As has been found in procedural justice studies in other legal contexts, voice and respectful treatment by authority emerged as significant determinants of outcome satisfaction in this study. However, contrary to expectations perceived coercion was not related to outcome satisfaction in the MHC sample (although this may be a consequence of the low variability in scores on our measure of perceived coercion).

Several interesting questions remain to be answered through future research. As noted above, within the framework of this ongoing study of the Broward MHC we will investigate the role, if any, that perceived coercion and PPJ play in longer term, more objective outcomes such as treatment participation and compliance, community adjustment, and recidivism. While reducing coerciveness and enhancing satisfaction with dispute resolution procedures are desirable objectives in their own right, the procedures that have evolved in the Broward court that (apparently) contribute to these outcomes come at some cost—for example, hearings may be prolonged somewhat by the judge's efforts to engage the defendant in mental health disposition planning. Those who place a greater premium on efficiency concerns may expect to see evidence of benefits that go beyond the subjective experiences of the MHC defendants.

It would also be interesting to compare the experiences of defendants across different MHCs on these subjective outcomes. The Broward court is but one of several models for an MHC (Goldkamp & Irons-Guynn, 2000; Watson, Luchins, & Hanrahan, 2001) and differences among them (e.g., degree of adherence to traditional roles and evidentiary procedures; interpersonal styles of the judges; pre- versus postadjudication implementation of mental health interventions and monitoring) may affect both the levels of perceived coercion and procedural justice and the degree to which these subjective factors affect longer range outcomes. Because of these unexplored considerations, the findings of the present study are primarily descriptive of the MHC experience in Florida and cannot be presumed to generalize to MHCs in other jurisdictions.

## Acknowledgments

This research was supported by grants from the John D. and Catherine T. MacArthur Foundation and the Florida legislature. We appreciate the comments and suggestions provided by John Monahan, Marvin Swartz, and Henry Steadman, who reviewed an earlier draft of this paper.

## References

Boldt, R. C. (1998). Rehabilitative punishment and the drug treatment court movement. *Washington University Law Quarterly, 76*, 1206–1222.
Cascardi, M., Poythress, N. G., & Hall, A. (2001). Procedural justice in the context of civil commitment: an analogue study. *Behavioral Sciences and the Law, 18*, 731–740.

Cascardi, M., Poythress, N. G., & Ritterband, L. (1997). Stability of psychiatric patients' perceptions of their admission experience. *Journal of Clinical Psychology, 53*, 1–7.

Diamond, R. J. (1996). Coercion and tenacious treatment in the community: applications to the real world. In D. L. Dennis, & J. Monahan (Eds.), *Coercion and aggressive community treatment: a new frontier in Mental Health Law* (pp. 51–72). New York: Plenum.

Gabbard, G. O., Coyne, L., Kennedy, L. L., Beasley, C., et al. (1987). Interrater reliability in the use of the brief psychiatric rating scale. *Bulletin of the Menninger Clinic, 51*, 519–531.

Gardner, W., Hoge, S. K., Bennett, N., Roth, L. H., Lidz, C. W., Monahan, J., & Mulvey, E. P. (1993). Two scales for measuring patients' perceptions for coercion during mental hospital admission. *Behavioral Sciences and the Law, 11*, 307–321.

Goldkamp, J. S., & Irons-Guynn, C. (2000). *Emerging judicial strategies for the mentally ill in the criminal caseload: mental health courts in Fort Lauderdale, Seattle, San Bernadino, and Anchorage*. Philadelphia, PA: Crime and Justice Research Institute.

Greer, A., O'Regan, M., & Traverso, A. (1996). Therapeutic jurisprudence and patients' perceptions of procedural due process of civil commitment hearings. In D. Wexler, & B. Winnick (Eds.), *Law in a therapeutic key: developments in therapeutic jurisprudence* (pp. 923–934). Durham, NC: Carolina Academic Press.

Group for the Advancement of Psychiatry (1994). *Forced into treatment: the role of coercion in clinical practice* (GAP Report #137). Washington, DC: American Psychiatric Press.

Hiday, V. A., Swartz, M. S., Swanson, J., & Wagner, H. R. (1997). Patient perceptions of coercion in mental hospital admission. *International Journal of Law and Psychiatry, 20*, 227–241.

Hoge, S. K., Lidz, C. W., Eisenberg, M., Gardner, W., Monahan, J., Mulvey, E., Roth, L., & Bennett, N. (1997). Perceptions of coercion in the admission of voluntary and involuntary psychiatric patients. *International Journal of Law and Psychiatry, 20*, 167–181.

Kaye, J. S. (1998). Lawyering for a new age. *Fordham Law Review, 67*, 1–11.

Lerner-Wren, G. (2000). Broward's Mental Health Court: an innovative approach to the mentally disabled in the criminal justice system. *Florida Defender*.

Lidz, C. W., Mulvey, E. P., Hoge, S. K., Kirsch, B. L., Monahan, J., Eisenberg, M., Gardner, W., & Roth, L. H. (1998). Factual sources of psychiatric patients' perceptions of coercion in the hospital admission process. *American Journal of Psychiatry, 155*, 1254–1260.

Lind, A. E., & Tyler, T. R. (1988). *The social psychology of procedural justice*. New York: Plenum.

McKenna, B. G., Simpson, A. I., & Laidlaw, T. M. (1999). Patient perception of coercion on admission to acute psychiatric services: the New Zealand experience. *International Journal of Law and Psychiatry, 22*, 143–153.

Monahan, J., Lidz, C. W., Hoge, S. K., Mulvey, E. P., Eisenberg, M. M., Roth, L. H., Gardner, W. P., & Bennett, N. (1999). Coercion in the provision of mental health services: the MacArthur studies. In J. P. Morrissey, & J. Monahan (Eds.), *Research in community mental health. Coercion in mental health services—international perspectives, vol. 10* (pp. 13–30). Stamford, CT: JAI Press.

Petrila, J., Poythress, N., McGaha, A., & Boothroyd, R. (2001, Winter). Preliminary observations from an evaluation of the Broward County Florida Mental Health Court. *Court Review, 14–22*.

Poulsen, H. D. (1999). Perceived coercion among committed, detained, and voluntary patients. *International Journal of Law and Psychiatry, 22*, 167–175.

Rabasca, L. (2000). A court that sentences psychological care rather than jail time. *APA Monitor, 31*(7), 58–60.

Second year progress report: July 1998–June 1999. The nation's first mental health court (1999). 17th Judicial Circuit, Broward County, Florida.

Stone, A. A. (1975). *Mental health and law: a system in transition*. Rockville, MD: NIMH.

Swartz, M. S., Hiday, V. A., Swanson, J. W., Wagner, H. R., Borum, R., & Burns, B. J. (1999). Measuring coercion under involuntary outpatient commitment: initial findings from a randomized controlled trial. In J. P. Morrissey, & J. Monahan (Eds.), *Research in community mental health, coercion in mental health services— international perspectives, vol. 10* (pp. 57–77). Stamford, CT: JAI Press.

Tyler, T. R. (1992). The psychological consequences of judicial procedures: implications for civil commitment hearings. *Southern Methodist Law Review, 46*, 433–445.

US Department of Justice (1999). *Mental health and treatment of inmates and probationers*. Washington, DC: Bureau of Justice Statistics, U.S. Department of Justice.

Watson, A., Luchins, D., & Hanrahan, P. (2001). Mental health court: promises and limitations. *Journal of the American Academy of Psychiatry and Law, 28*, 476–482.

Wertheimer, A. (1993). A philosophical examination of coercion for mental health issues. *Behavioral Sciences and the Law, 11*, 239–258.

Wexler, D. B. (1990). *Therapeutic jurisprudence: the law as a therapeutic agent*. Durham, NC: Carolina Academic Press.

Wexler, D. B. (1999). Therapeutic jurisprudence and the culture of critique. *Journal of Contemporary Legal Issues, 10*, 263–277.

Wexler, D. B., & Winick, B. J. (1991). *Essays in therapeutic jurisprudence*. Durham, NC: Carolina Academic Press.

Woerner, M. G., Mannuzza, S., & Kane, J. M. (1988). Anchoring the BPRS: an aid to improved reliability. *Psychopharmacology Bulletin, 24*, 112–118.



International Journal of Law and Psychiatry 26
(2003) 33–53



**Pergamon**

# Seattle's mental health courts: early indicators of effectiveness

Eric Trupin*, Henry Richards

Department of Psychiatry and Behavioral Science, University of Washington School of Medicine,
146 North Canal Street, Suite 100, Seattle, WA 98103, USA

## 1. Introduction

Courts specializing in the adjudication of mentally ill defendants are relatively new to the United States. Steadman, Davidson, and Brown (2001) proposed a four-part functional definition of a mental health court (MHC): (1) all identified mentally ill defendants are handled on a single court docket, (2) the use of a collaborative team which includes a clinical specialist who recommends and make linkages to treatment, (3) assurance of availability of appropriate clinical placement prior to the judge making a ruling, and (4) specialized court monitoring with possible sanctions for noncompliance. Other authors have stressed the view that MHCs are primarily vehicles for the practice of therapeutic jurisprudence, defined as the process of fostering therapeutic outcomes by legal means, or at least considering the therapeutic or antitherapeutic outcomes resulting from the legal process (Casey & Rottman, 2000; Wexler & Winick, 1996).

Publications on MHCs have been primarily limited to descriptions of MHCs and their implications from legal, health, and social policy perspectives. There remains a virtual absence of empirical data elements in published accounts, with the exception of basic program statistics, such as number of defendants screened, adjudicated, and supervised. Although a major evaluation of the Broward County Mental Health Court is underway, and a description of the evaluation's methods, measures, and challenges is available (McGaha, Boothroyd, Poythress, Petrila, & Ort, 2002), empirical reports from that research are only beginning to emerge (see Boothroyd et al., this issue; Poythress, Petrilla, McGaha, & Boothroyd, 2002), and analyses for many facets of that study are still in preparation. Heretofore, empirical evidence of the effectiveness of MHCs has been very limited and benchmarks from which different court

---

* Corresponding author.
E-mail address: trupin@u.washington.edu (E. Trupin).

0160-2527/03/$ – see front matter D 2003 Elsevier Science Inc. All rights reserved.
PII: S0160-2527(02)00202-9

models or courts working within the same model can be compared have not been established. Generalizing from the few available observational accounts may be particularly misleading because many important contextual factors, such as the characteristics of the legal and mental health systems in which they operate, vary markedly from court to court. Commonalities and differences among MHCs, such as those outlined in descriptive reviews (Goldkamp & IronsGuynn's, 2000; Watson, Hanrahan, Luchins, & Lurigio, 2001), may be more related to contextual contingencies rather than to the court models per se. Clarifying how contextual factors impact the implementation of empirically validated treatment models is increasingly understood as central to expanding the application of such models (Brickman, 2002; Henggeler, Lee, & Burns, 2002). Applying the same principle to MHCs even if effectiveness were to be demonstrated for a few individual courts, we would still be wanting for the kind of understanding of the impact contextual factors that could inform implementation of program models in divergent environments. Nonetheless, local initiatives and Federal legislation (Public Law 106-515, American's Law Enforcement and Mental Health Project) are providing momentum and financial support for the expansion of MHCs across the United States.

This paper is intended to advance the state of knowledge concerning MHCs in two ways. Firstly, we summarize findings from separate acceptability and effectiveness evaluations conducted at the request of the respective governing bodies of two MHCs in Seattle, WA. These evaluations combined process evaluation methods, such as interviews and surveys of key informants and surveys of stakeholders, with quantitative analyses of early data related to reincarceration, time spent in detention, and linkage/engagement with mental health services as a result of MHC participation. Secondly, by comparing and contrasting evaluations from two courts sharing a fairly uniform set of contextual factors, we hope to further set the stage for future research into the effect of such factors on MHC acceptability, organizational structure, functioning, and effectiveness. We see this focus on contextual factors as a natural extension of the concept of ecological jurisprudence (Slobogin & Fondacaro, 2000), in which the context and situation in which the individual interacts is considered with along with such factors as inherent mental disorder or impairment. Family setting, neighborhood, and access to resources are among the factors that are considered from the ecological jurisprudence perspective. Applying the notion of ecological jurisprudence to evaluation would involve developing understandings of how institutional and systemic factors influence courts and, in turn, how courts impact the interaction of individuals in their environment.

Seattle, WA's MHCs are organized at different levels of government (municipal vs. county) and have different geographical defendant pools (urban vs. suburban/exurban). Nonetheless, these courts share many contextual factors that might be reasonably believed to shape differences between MHCs and to impact effectiveness of such courts. The two MHCs are geographically located within blocks of each other, are limited in jurisdiction to misdemeanors, use the same detention facility, and make treatment referrals to the same community agencies. Defendants may have criminal charges in both courts simultaneously. Given the relative comparability of contextual factors, we hypothesized that differences

between the practices and impacts of these courts are more attributable to differences in decisions, values, and preferences embodied in their models and personnel, as opposed to contingencies of the immediate environmental context, than might be the case if comparisons were made between courts in different cities or states. Nevertheless, we acknowledge that the assumption of shared contextual factors among MHCs fostered by the same city may be no more accurate than, for example, the assumption of shared experiences of parenting practices and attachment experiences for different siblings in a household.

## 2. Origins of Seattle's MHCs

Seattle's MHCs trace their origins to the political and judicial response to public outcry after the stabbing death of retired fire department captain Stanley Stevenson by a mentally ill misdemeanant in August of 1997. The attacker had been recently released from the county jail, after being found incompetent to stand trial for bicycle theft charges and, despite hospital reports indicating his dangerousness, not civilly committed. In the aftermath of this tragic incident, the County Executive, Ron Sims, convened a Mentally Ill Offender Task Force, designed to have broad participation from influential stakeholders. Former State Supreme Court Justice Robert Utter chaired the Task Force, which issued recommendations only 3 months after Capt. Stevenson's death. Among other innovations, the task force spearheaded revision of the state's criminal competency laws, called for writing legislation expanding circumstances for ordering involuntary treatment, and recommended the establishment of a county MHC. The cultural context of these innovations included a longstanding tradition in Western Washington of public sympathy with civil libertarian concerns regarding the need for caution in the use of involuntary commitment, and in instituting laws or practices that might infringe on rights of mentally ill persons, or which might result in their being further stigmatized for their illness.

Two Seattle judges who observed Judge Wren's Broward County MHC as part of their task force participation later presided over MHCs at the county and municipal levels. The King County District Mental Health Court (KCMHC) was formally instituted and dedicated to the memory of the slain fire department captain in a public ceremony in February 1999. By April of the same year, the Seattle Municipal Court began operating a mental health court (SMMHC), but without being formally identified in either the municipal code or municipal court structure.

## 3. Mental health system

Public mental health services for King County, including those for the city of Seattle, shifted from a fee-for-service to a managed care service system in 1995. The system shifted again in 1999 to a risk-based contract in which the county assumed financial responsibility for both inpatient and outpatient services. Formally, separate addiction and mental health services were combined by under a single administrative umbrella.

Not only were residents in the jurisdictions of both MHCs covered by the same managed care firm, there was a substantial overlap among agencies providing the bulk of treatment services to individuals participating in the two courts, making the distinction between the courts somewhat ambiguous in the perception of many individual providers, with the larger SMMHC having the more prominent profile. Although the SMMHC shared this system with the KCMHC, the county managed the contract, arguably resulting in more direct influence for the county court, KCMHC. Both MHC teams included a clinical social worker employed directly by the managed care firm. Referred to as court monitors, these clinicians provided front-line screening and assessment services and made client-specific referrals for mental health services. Although both court monitors generally filled the role described by Steadman (1992) as criminal justice/mental health system boundary spanners, they differed to the extent that they were able to serve as treatment brokers, in that the KCMHC clients were officially given priority access to services, whereas priority access or other forms of special attention to the needs of mentally ill misdemeanants in the SMMHC was effected by more informal mechanisms. Restricted resources for needed mental health and substance abuse treatment services was another shared contextual factor for these MHCs, which experienced actual or threatened resource reductions periodically during the MHCs founding period and during the period of the evaluations described here. Notably, appropriate housing for MHC participants and integrated substance abuse services for the mentally ill were ubiquitously described as unavailable by the court monitors.

A centralized assessment unit conducted trial competency evaluations for both jurisdictions. Evaluations were conducted either in the jail or at the hospital, 45 miles south of Seattle. Also, determining the need for involuntary detention pending civil commitment proceedings was the responsibility of the same pool of County Designated Mental Health Professionals, who conducted most MHC-associated evaluations in the county detention facility.

## 4. Adult detention

The King County Department of Adult and Juvenile Detention managed jail services for the jurisdictions of both courts, with county and city police departments booking defendants into the jail in downtown Seattle and county police booking defendants at smaller regional detention centers. Whereas the most common site of arrest for SMMHC defendants was downtown Seattle, Seattle–Tacoma International Airport was one of the most common arrest sites for KCMHC defendants. Both courts developed mechanisms of identification, referral, and progress reporting with jail mental health personnel. Treating psychiatrists and nurses in the jail were county health department employees. Staff involved in screening, assessment, and crisis/custodial management issues were for the most part trained in psychology or counseling as a core discipline, and worked directly for the jail.

## 5. Goals and organization

A review of written materials provided by these MHCs revealed that they had substantially the same stated goals focused on improving adjudication of mentally ill misdemeanor defendants (MIMDs). Both courts explicitly held the view that persistent and debilitating mental illnesses are organic disorders requiring treatment, and that jails are not preferred treatment sites. Both courts shared the goal of reducing jail time by using the optimal community placement strategy consistent with public safety, and included linkage to treatment and fostering of success in treatment as integral aspects of the court's rationale. Although treatment with psychiatric medication was the focus of most linkage activity, referrals to psychosocial programs, substance abuse treatment services, housing, and other services were also deemed essential. These courts also shared the goal of improving linkages and understanding between otherwise separate parts of the criminal justice and mental health systems.

Both courts were structured for voluntary participation of defendants along the lines of drug courts and consistent with plea-bargaining of reductions in jail sentences in exchange for treatment engagement and community supervision of a longer period than that typical for most misdemeanants. Both courts received referrals from defense attorneys and other courts in the same jurisdiction. The KCMHC received most of its referrals from jail health or psychiatric evaluation staff, whereas the SMMHC, which was situated in the arrangement court, identified a large number of referrals during the arrangement process in addition to receiving referrals from jail staff. For both courts, referred defendants were approached by the court monitor, who would describe the nature of the MHC and the requirements and benefits of participation. Defendants who expressed interest in considering participation were scheduled for an initial hearing, wherein the judge would evaluate the basis for their eligibility and confirm the defendant's understanding of the MHC, particularly the fact that participation was voluntary. At some point, defendants were asked to decide on participating (opt-in) or declining participation and going on to trial in a regular court (opt-out). Under Washington State law, the MHCs maintained jurisdiction over misdemeanant cases while the defendant was involved in competency evaluation or restoration of competency. The SMMHC described itself as open to considering re-referral after an initial voluntary decision to opt-out and to taking responsibility for supervision of mentally ill probationers referred by other municipal courts. Typically, individuals who opted for trial in the KCMHC were not reaccepted on the same charge, but could be considered for eligibility on a different charge.

## 6. The court teams

On one level, describing the composition and roles of the MHC team is roughly equivalent to describing the court model. Both courts utilized a dedicated team approach, wherein, as far as operationally possible, throughout their adjudication experience, MIMDs would relate to the same group of court professionals. Both courts were defined as judge-centered teams, which included a clinical social worker (referred to as the court monitor), prosecuting attorney, probation counselors, defense attorney supported by a part-time social worker, and

a program manager/coordinator. The court monitors assessed clinical status, treatment needs, and program suitability, and worked for the mental health managed care provider. Information collected by the court monitor was communicated to the court if the defendant signed a release of information. It was assumed that the court monitors' clinical astuteness, and not infrequent personal knowledge of both MIMDs and local program characteristics and personnel, would enable them to make optimal referrals, thereby increasing the chance of defendant engagement in treatment and treatment effectiveness. To some extent, court monitor role involved aspects of informal clinical risk assessment, in that risk management recommendations were provided to the courts. Both courts utilized public defender offices that employed social workers that were expected to provide corresponding clinical support to the defense in team planning and in formal hearings.

Although the two courts developed similar in-court methods such as longer hearings, early hearings to determine eligibility/suitability, and later "opt-in or out" hearings for defendants to make the participation decision, a significant structural aspect separated the two courts. The SMMHC shared its judge, courtroom, and prosecutor with the general arraignment court. In contrast, the KCMHC judge was allocated several full days per week for this role and the KCMHC had its own courtroom. Although providing an opportunity for early identification and referral of mentally ill defendants, this arrangement of the SMMHC, when contrasted to the KCMHC, reduced the availability of time in-court, preparatory time for key members, such as the judge, and limited time for meetings of the entire team. Although both courts used a small amount of grant money to get started, the bulk of resources consisted of internal reallocations within their respective court systems. Notwithstanding these resource constraints, the KCMHC enjoyed formal recognition as a separate entity by the County Executive, County Council, and the Presiding Judge of the District Court, whereas the SMMHC had a less formal existence within the Seattle Municipal Court structure.

## 7. Evaluation methods

Since the purpose of this paper is to summarize and combine selected findings across two previously performed evaluations, the methods, procedures, analyses, and results are described here in less detail than in the original evaluation reports. The original evaluation reports contain a fuller description of methods and procedures, as well as lists of individuals interviewed, tables of descriptive statistics and related tests of statistical significance, and some findings in addition to those described here. These reports (Trupin, Richards, Lucenko, & Wood, 2000; Trupin, Richards, & Werthiemer, 2001) are available online, or can be obtained from either the MHCs studied, or from the authors.

We completed a process evaluation with preliminary outcome data for the KCMHC in the fall of 2000 and a year later performed a similar evaluation of the SMMHC. The evaluations were performed at the request of the King County District Court and the Seattle Municipal Court, respectively. The evaluations were spurred on in part because of the need to justify resource allocations to courts in general, and because of their reduced caseloads, specialty courts were under particular budgetary scrutiny. Both MHCs formed evaluation committees to interact with the evaluators regarding the structure and scope of the evaluation effort, and,

as the evaluations progressed, to assist in understanding the emerging information from multiple informed perspectives. The final reports of these preliminary evaluations were delivered to the larger court bodies in which each MHC operated, and findings and recommendations were presented in open session to the legislative bodies of the respective jurisdictions.

Three methods were used in the quantitative, process component of the evaluations. Direct observation of the court and reading of relevant court-generated descriptive documents by the evaluators was followed by the administration of structured and semistructured interviews with key informants and key stakeholders. For the KCMHC only, an anonymous survey of opinions about the court was administered to a subset of key informants who worked in agencies supporting court functions (i.e., jail staff and mental health agency staff). The quantitative component of the evaluation consisted of the collection and analysis of archival mental health, detention, and court system data relevant to MHC outcomes and impacts.

## 8. Qualitative methods

Interview questions and empirical data elements were sufficiently similar to allow for comparisons between the MHCs and there was substantial overlap in key informants. An 11page structured interview form containing open-ended questions and items with Likert scale and multiple-choice response formats was administered to key informants. We defined a key informant as an individual identified as likely to have substantial and detailed knowledge of an MHC, its clients, social, political, and institutional contexts, or of impacts/outcomes that might be attributable to court participation or nonparticipation. We used a one-page semistructured interview format with key stakeholders defined as individuals identified as having a specific investment in, or responsibility for, one or more factors affecting an MHC or its clients, but with less direct or detailed knowledge than a key informant. In addition to relying on our own knowledge of the local and regional environment, members of the evaluation committee for each respective MHC suggested names for the list of interviewees. Those interviewed included members of the MHC teams, administrators from several levels of city, county, and state governmental agencies, the heads of patient advocacy groups, judges, attorneys from both sides of the bar, and a few elected officials other than judges. Some interviews were conducted in small groups. For example, case managers from a single mental health agency and persons from the city or county budget office were interviewed together.

Interviews were audio taped whenever this was agreeable to the interviewees. Otherwise, close to verbatim responses were recorded for responses to open-ended questions. These notes were later coded twice for themes, first using ad hoc categories developed by each interviewer based on emergent themes, and again later, after the evaluation team had gained consensus on prominent themes. Although informant's agreed to have their names listed as evaluation participants in final reports, they signed consent forms promising strict confidentiality of the content of their responses and comments. Informants were made aware that they would not be quoted in any written report without a separate written consent to do so, and that they could request that specific responses or comments be recorded verbatim. Informants were offered

the opportunity to read the interviewers' transcriptions or notes of their own responses in order to comment on their accuracy, but they were not allowed access to anyone else's responses or comments. The questions were made available to interviewees prior to the scheduled interviews. A few informants chose to provide the researchers with audio taped or written responses to interview questions, which allowed for a more informal follow up interview. A few individuals were contacted after their initial interview for clarification of their responses or comments, but for the most part this was unnecessary due to the availability of audiotape, verbatim or close to verbatim notes, and multiple interviewers being present during the original interviews.

For the KCMHC, 22 key informants and 12 key stakeholders were interviewed, and 18 agency staff were administered an anonymous survey, making some overlap with the survey and interviews possible. For the SMMHC, 54 key informants and 22 key stakeholders were interviewed. Although most interviews were conducted with pairs of informants, four groups of five or more were also used. Understandably, due to the shared environments of the courts, some overlap of key informant and key stakeholder list occurred between the two MHC evaluations.

For the qualitative component of the evaluations, program effectiveness indicators were developed for the following domains: public safety, decriminalization, program gate-keeping, program integrity/continuity, organizational structure, case processing, system linkage, clinical focus, treatment, civil liberty/rights focus, and information management.

## 9. Quantitative methods

### 9.1. Participant pools and data elements

Data was collected for new referrals to both courts during specific periods of observation. For the KCMHC, data was collected on the 246 individuals referred during a 13-month from the official start of the court on February 18, 1999 through March 16, 2000. For the SMMHC, we collected data on the 158 individuals referred during a 5-month interval between February 1, 2000 and June 30, 2000. The start of this interval was the date at which the full SMMHC team contingency with two probation officers was in place. For both MHCs, the end dates for determining the participant pool was set to allow for a minimum of 9 months of observation post MHC referral. We collected data related to demographics, diagnosis, charge type, and decision to participate in the MHC for all participants referred during these intervals. More complete mental health, charge characteristics, and jail related data were collected for a subset of participants for each court. Some participants were referred to these courts on more than one occasion, for different charges. During the observed periods, approximately 19 unduplicated individuals were referred to the KCMHC each month, whereas the SMMHC received almost 32 unduplicated referrals, reflecting the fact that the SMMHC, which serves densely populated, urban Seattle, was a higher volume court than the KCMHC.

The courts provided data related to defendant demographics, the date and outcome of the defendant's decision regarding MHC participation, and criminal case information for cases under the jurisdiction of the MHC. Mental health data was captured from King County's

automated system. Mental health data elements included primary diagnosis, personality disorder diagnosis, substance abuse history and readiness to engage in substance abuse treatment, mental health system enrollment status and history, and number and duration of treatment episodes. Detention and charge data were collected from automated systems maintained by the courts and the detention facility. Jail system data included bookings, length of detention per booking, and time spent outside of jail in other, usually mental health facility, and confinement.

## 9.2. Approach to data analysis

We used both a pre–post and group comparison approach to investigate the impact of MHC participation. For the pre–post comparisons, we compared charge, detention, and mental health data for participants prior to their MHC contact to their own data for the period observed after MHC contact. These analyses were performed after mean or aggregate scores were adjusted for months of observation in the pre and posts periods. Our primary interest was in participants who had volunteered to participate in the MHC process and were subsequently placed, or remained, in the community at risk for new charges, eligible for community-based treatment services, and under MHC supervision. These participants, referred to as opt-ins, were compared to various groups comprised of individuals referred to the same court. We also compared outcomes between the two courts for a few important variables.

For the SMMHC evaluation, most analyses were conducted on 65 opt-in participants and 82 opt-out referrals. For the KCMHC, most analyses were conducted on 31 opt-in participants and 46 opt-out referrals. The number of subjects in the analyses related to specific findings varied due to missing data. All participants were facing misdemeanor charges at the time of referral and had a confirmed diagnosis of mental illness. Although examination of participant characteristics revealed that the opt-in and opt-out participants for both MHCs had similar demographic and primary diagnostic characteristics, opt-outs tended to have less severe index charges and, therefore, may have been facing less severe sanctions if convicted after a trial. Our interviewees had also alerted us to the possibility that referrals that eventually became optouts often had more severe substance abuse and dependency problems, and less severe mental health problems than referrals that eventually became opt-in participants. We adopted a quasiexperimental approach in comparing and contrasting relevant groups of similar individuals, who nonetheless had some known relevant dissimilarities such as severity of the index offense.

## 10. Results

### 10.1. Participant characteristics

Approximately 75% of those referred were male and the decision to volunteer for the court was not related to gender. The average age of participants was 38.57 (11.05) for the SMMHC and 37.6 (10.95) for the KCMHC. Approximately 60% of participants from both courts

selfidentified as White, the SMMHC had almost double the proportion of African American and Asian participants (33.8% and 6.2%, respectively) as did the KCMHC (15.4% and 2.4%, respectively). The reverse was the case for the relative proportion of Native Americans

Table 1
Process/qualitative domains and assessed indicators

| | Seattle Municipal MHC | King County MHC | Comments |
|---|---|---|---|
| **Public safety** | | | |
| Protection of public safety | High | High | Minority view: overstated concern for MIMD offending in both MHCs |
| Rapid response to violations/deterioration clinical status | High | Moderate to high | |
| Priority exercise of MHC Bench Warrants upon request | High | Moderate | SMMHC "MHC Warrant" expedited by police |
| **Decriminalization** | | | |
| Diversion prior to arraignment | Low | Low | Most participants enter guilty plea in both MHCs |
| Possibility of avoiding criminal record | Moderate | Low to moderate | |
| Reduced jail days | Low to moderate | Low to moderate | Assessment and search for best community placement may increase jail time in some cases |
| Reduced bookings | Moderate | Moderate | Perception that revolving door was slowing down for MIMDs |
| Sanctions/revocation decisions informed by clinical status | Moderate to high | Moderate to high | Motivation and reasons for failures to comply were carefully assessed |
| **Program gate keeping** | | | |
| Reaching target population | High | High | |
| Clear and welldiscriminated edibility criteria for participation | Moderate to high | Moderate to high | Concern about overlap with primary drug using population and appropriateness of organically impaired defendants |
| Early identification by police | Moderate | Low to moderate | Geographically difficult for KCMHC, which services different localities |
| Identification at arraignment | High | Moderate | SMMHC doubles as arraignment court |

| | | | |
|---|---|---|---|
| Adequate identification/ referral in jail and other courts | Moderate | Moderate | Some judges not referring appropriate cases to Seattle MHC. Loss of a jail psychiatric liaison worker impacted both MHCs |
| Program integrity/continuity | | | |
| Written orientation materials | High | Low to moderate | SMMHC very well documented |
| Operation consistent with philosophy | High | High | |

Table 1 (continued)

| | Seattle Municipal MHC | King County MHC | Comments |
|---|---|---|---|
| Program integrity/continuity | High | Moderate | |
| Shared mission and philosophy | | | Expectation of availability of complete diversion by public defender in KCMHC |
| Shared goals and problemsolving focus | High | Moderate | Defense not consistently invested in problem-solving focus in KCMHC |
| Written role/job descriptions | High | Low to moderate | Defense social worker had very limited involvement and impact on in-court process for both MHCs |
| Adversarial process does not impede collaboration | High | Low to moderate | Information sharing cumbersome and often limited in KCMHC |
| Organizational structure | | | |
| Formal legal status | Low | Moderate to high | |
| Formal status in court administrative structure | Low to moderate | Moderate to high | |
| Formal identification in budget | Low | Low | |
| Dedicated staffing for key roles | Low to moderate | Moderate to high | Judge time and attention shared with arraignment process in SMMHC |
| Case processing | | | |
| Expedited case processing | High | Moderate to high | Very high priority in the SMMHC |
| Defendant focused case consolidation | Moderate | Moderate | |
| Specialized court hearings | Moderate to high | Moderate to high | |
| System impact | Moderate to high | Moderate to high | |
| Increased linkages/ communication between systems | | | |

44    E. Trupin, H. Richards / International Journal of Law and Psychiatry 26 (2003) 33–53

| | | | Comments |
|---|---|---|---|
| Engagement of key community stakeholders | Moderate | Moderate | Absence of advisory or community boards for either MHCs |
| Adds to resources for MIMDs | Low | Moderate | Additional funds attached to MIMDs in KCMHC |
| Clinical focus Specialized clinical probation monitoring | High | High | Clinical social workers were probation supervisors in both MHCs |
| Access/use of standardized assessment instruments | Low | None | |

(continued on next page)

Table 1 (continued)

| | Seattle Municipal MHC | King County MHC | Comments |
|---|---|---|---|
| Clinical focus Monitoring/intervention regarding treatment effectiveness | Low to moderate | Low | Appropriateness and effectiveness of treatment not addressed by either MHCs |
| Monitors treatment compliance | Moderate | Moderate | For both MHCs, routine probation supervisor contact with case managers was supplemented by telephone reports prior to review hearings |
| Allows sufficient time for hearings | High | High | |
| Courtroom environment/ atmosphere appropriate for MIMDs | Low | Moderate | SMMHC crowed, fast paced, and in the jail environment |
| Requires/strongly encourages clinician testimony/reports | Low to moderate | Low to moderate | Few written reports in KCMHC. Both MHCs tried to conserve use of clinician time for appearances or written reports |
| Treatment referral/engagement Priority or dedicated access to services | Low | Moderate to high | KCMHC had priority for services with some additional compensation for providers |
| Increased engagement beyond referral | Moderate to high | Moderate to high | |
| Referral/linkage to mental health services | High | High | |
| Linkage/referral to substance abuse treatment services | Low to moderate | Low to moderate | Limited access to intensive outpatient substance abuse treatment services for mentally ill persons |

E. Trupin, H. Richards / International Journal of Law and Psychiatry 26 (2003) 33–53          45

| | | | |
|---|---|---|---|
| Linkage/referral to housing | Low | Low | Housing very limited, especially for individuals with *drug, alcohol, or violence* problems in their history |
| Civil liberty/rights focus Appropriate concern for defendant's right to liberty and choices | Low to moderate | Moderate to high | Some informants viewed SMMHC as overly coercive and as preempting some defendant rights |
| No negative impact due to identification and referral | Moderate | Moderate | |
| No negative impact for requesting trial | Moderate | Moderate to high | Minority view that SMMHC opt-out offers from prosecution constituted an increase in typical sanctions |

Table 1 (continued)

| | Seattle Municipal MHC | King County MHC | Comments |
|---|---|---|---|
| Civil liberty/rights focus No unresolved due process concerns | Moderate | High | Minority view that SMMHC prehearing meeting without the defendant present was an important due process concern |
| Confidentiality   maintained by defendant | Moderate to high | High | Minority view that court monitor role had resulted in some breaches of confidentiality in KCMHC. Open discussion of closed competency/commitment process raised for the SMMHC |
| Early termination of supervision possible | Moderate | Moderate | |
| Information management Adequate information available at hearings | Moderate to high | Low to moderate | |
| Retrievable data: diagnostic and clinical engagement | Moderate | Low to moderate | Very little written documentation in the KCMHC |
| Retrievable data: demographic and case history | Moderate | Moderate | Case file systems |
| Retrievable outcomes: revocations and sanctions | Moderate to high | Moderate to high | Automated online systems |
| Retrievable data: new bookings and charges | High | High | Automated online systems |

Ratings are on a dimension of low to high appropriateness or accomplishment, five anchors: low, low to moderate, moderate, moderate to high, high, not applicable (NA).

46        E. Trupin, H. Richards / International Journal of Law and Psychiatry 26 (2003) 33–53

between the courts, with the SMMHC (3.1%) proportion being under a third of that for the KCMHC (11.1%). The decision to participate in these courts did not vary significantly with ethnicity. Most participants were diagnosed as having psychotic or major mood disorders as the primary focus of mental health intervention, with the SMMHC having a significantly higher proportion of individuals diagnosed with a psychotic disorder when compared to the KCMHC (64.7% vs. 45.1%, respectively).

## 10.2. Qualitative indicators of MHC effectiveness

Table 1 contains results for each court on indicators for the 11 domains of effectiveness, which were qualitatively assessed. These domains are public safety, decriminalization, program gate keeping, program integrity/continuity, organizational structure, case processing, system impact, clinical focus, treatment referral/engagement, civil liberty/rights focus, and information management. The rating for each indicator reflects the general consensus of interviewees along the dimension of appropriateness/achievement with the following categor-

46

**Table 2**

Quantitative evidence for MHC effectiveness

| Indicator S | MHC-specific findings | | | | Findings generalized |
|---|---|---|---|---|---|
| | Seattle MHC evidence type | | King County MHC evidence type | | |
| | Opt-in pre-post | Comparison groups | Opt-in pre-post | Comparison groups | |

E. Trupin, H. Richards / International Journal of Law and Psychiatry 26 (2003) 33–53

**Criminalization/recidivism**

| | | | | | |
|---|---|---|---|---|---|
| Booking rate | Decreased; P<.05, d=0.587, r=.282 | Group of all referred individuals. Deceased bookings significantly pre–post; P<.001, d=0.528, r=.255 For Opt Out only, those with any new reincarceration after MHC had reduced bookings after MHC contact; P<.025, d=0.517, r=.250 | P<.025, d=0.617, r=.295 | NS | Decreased reincarceration medium effect |
| Mean charge severity | NS | NS | NS | Increased for opt-out, but not for opt-in; P<.05, d=0.501, r=.243 | Prevention medium effect[a] |
| Jail LOS per booking | Increased; P<.025, d=0.351, r=.173 | Increase for sample as a whole; P<.01, d=0.200, r=.010 | NS | Increased for sample as a whole; P<.05, d=0.562, r=.270 | Increased sanction medium effect |

| Outcome | | | | | Conclusion |
|---|---|---|---|---|---|
| | $P<.01$, | $d=0.779$, $r=.363$ | significantly; $P<.05$, $d=0.442$, $r=.216$ | jail days; $P<.03$, $d=0.766$, $r=.356$ | for participants medium to large effect |
| Annualized jail LOS pre-post following new booking | NS | Increased for opt-out only; $P<.01$, $d=0.606$, $r=.290$ | Trend toward increase; $P=.069$ | Increased for sample as a whole; $P<.001$, $d=0.840$, $r=.387$ | Increased sanction after reincarceration large effect |
| Treatment referral, engagement, impact | | | | | |
| Treatment referral linkage | 95.4% | NA | 84% enrollment | Opt-in higher than opt-out, 84% vs. 54%, $P<.01$ | Increased linkage large effect |
| Monthly treatment hours | NS | Trend toward increase in opt-outs; $P=.057$, two-tailed | Increased; $P<.001$, $d=0.349$, $r=.172$ | NS | Increased treatment hours medium effect |
| Global assessment of functioning ratings | NA | NA | Increased; $P<.05$, $d=0.257$, $r=.128$ | Decreased in opt-out group; $P<.001$, $d=0.612$, $r=.293$ | Improved functioning small effect |
| | | | | | Prevention of deterioration medium effect[a] |

NS=not significant; NA=not assessed.

[a] More tentative conclusion based primarily on considering differences between findings for Opt-Out and Opt-In participants.

ies: none to low, low to moderate, moderate, moderate to high, high, and not assessed. Although a similar scale was used for some indicators in the original evaluations, the ratings in this table are derived from the evaluator's synthesis of all available qualitative information, and therefore are both somewhat subjective and do not have the strength of a complete listing of known exceptions and minority viewpoints. The comments column for each MHC is used to provide some of this level of detail and divergent, rather than convergent, information.

## 10.3. Quantitative indicators of MHC effectiveness

Indicators for each quantitative domain were evaluated for each court separately by means of one or both of two methods. The first method used to assess the indicators was that of pre–post analyses comparing data on each opt-in participant prior to referral to their own data after MHC referral. The second method utilized data for one or more comparison groups of referred individuals who did not chose to participate in a MHC, the opt-out participants. A pre–post design was followed in this method as well, and these analyses also incorporated opt-out data.

In the original evaluation reports, results were reported as either differences between means or correlations with associated statistics and probability levels. For purposes of this article, results from original analyses were converted to one of two effect size measures, Cohen's d (Cohen, 1988) and the effect size r. Cohen's d and can range from 0 to 2. Although the meaningfulness of an effect size depends on comparing it to those found in similar studies in the same field, Cohen generally described effect sizes of d=0.2 as small, d=0.5 as medium, and d=0.8 as large. The effect size r is closely related to the more familiar Pearson correlation coefficient and measures the relationship between an indicator (dependent variable) and group membership (i.e., treated or untreated). The square of r is the percent of variance accounted for in indicator scores by group membership status. An r-value of .6 means that group membership accounts for .36, or 36% of the variance in respective indicator scores, whereas an r-value of 1 means that group membership accounts for 100% of the variance in indicator scores. Given the quasi-experimental nature of our approach, the reader is reminded that the term "effect" used here in describing effect sizes refers to the magnitude of pre–post differences or differences between groups, rather than a firm inference that participation or nonparticipation in a MHC was the only defensible explanation of the observed differences.

Table 2 summarizes quantitative evidence relevant to evaluating the effectiveness of these MHCs. Each MHC is summarized separately, as are the evidence from one or both of two methods used to assess effectiveness indicators. Significance levels from the original analyses (t-test, paired t-test, nonparametric test, correlation, etc.) are provided in the table but not the full statistical test. Where available, but only when the original statistical test was significant at or below P<.05, Cohen's d and the effect size r are reported for each indicator. The final column of this table summarizes the type and direction of impact and range of effect sizes for each indicator. We chose not to combine the effect sizes, as in a meta-analysis, since we considered a single composite measure based on only two studies as less informative than providing the effect sizes from both studies.

## 11. Qualitative discussion

The effectiveness ratings we derived from key informant and key stakeholder responses tended to be highest for indicators that were within the direct control of the MHCs such as the indicators the public safety domain, and lowest for indicators that were primarily contingent on external resources, such as linkage/referral to housing and linkage/referral to substance abuse treatment services. Similarly, ratings of indicators in the program gatekeeping domain, which are generally in the control of the MHC, tended to be moderate to high.

Although we attempted to be as objective and inclusive as possible in identifying indicators of effectiveness that might be applicable to MHCs, this task is inextricably connected to the prescriptive aspect of evaluation, that is, the process of deciding what MHCs should be and do. We found both low to moderate ratings and lower informant consensus on those indicators that were related to contested characteristics of an effective MHC. For example, the MHCs received low ratings on the reduced jail days indicator in the decriminalization domain. Some informants viewed the diversion prior to arraignment indicator as undesirable, as an indicator of effectiveness, arguing that many MIMDs who may be characteristically lacking in insight into their illness, or for some other reason are unmotivated or unable to consistently engage in treatment on their own, may be capable of responding to the structure of an MHC, which includes formal criminal charges and the possibility of sanctions.

Informants also disagreed about the value of reduced jail days as an indicator or performance for several reasons. The expectation of immediately reducing detention costs by reducing jail days served by MIMDs (who were to be managed in more appropriate, treatment-oriented facilities or community-based treatments) had been a major rationale offered for establishing and maintaining these MHCs, which required transferring some resources from the criminal justice system to the mental health system, and dedicating court resources, thus reducing case processing productivity. Nonetheless, our informants often counterbalanced the value of reducing jail days with other values, such as for need to be sure that the MIMD was stable and had a well-formulated placement plan, complete with appropriate housing and treatment that was likely to be effective at maintaining the stability achieved during incarceration and enabling the MIMD to remain in the community at longer intervals without psychiatric or legal setbacks. Many informants argued that either a breakeven in jail days or even a slight increase might result from effective MHC case management. The goal of breaking the revolving door cycle was also cited, with the accompanying expectation that initially the number of episodes of incarceration and their duration might increase, due to increased surveillance by probation counselors, but that over longer intervals of observation than those used in the studies reported here, reductions in number of incidents, incident severity, jail days per booking, and total annual jail days would be demonstrable.

We found that although many informants felt that some indicators might have value, they were skeptical concerning their feasibility, given the limited timeframes and staff resources

that MHC work within. Indicators such as access/use of standardized assessment instruments, *requires/strongly encourages clinician testimony/reports were sometimes viewed as* unattainable due to the need for rapid turnaround of assessments and the perception that time spent preparing for and appearing at hearings would detract from the ability of clinicians to provide needed services to MHC participants. Some informants were not optimistic about the ability of MHCs to impact systems and resources as reflected in indicators such as monitoring/ intervention regarding treatment effectiveness and adds resources for MIMDs, although they *saw indicators as reflecting these as acceptable goals. Other informants saw these areas as* outside the appropriate purview of the courts, being rather the responsibility of the various administrations overseeing mental health services.

## 12. Quantitative discussion

Statistically significant evidence from both courts suggested impacts on relevant criminal justice and mental health indicators of effectiveness. In most cases, the measured effects were in the direction that would be expected for programs intended to reduce crime and criminal justice sanctions while increasing treatment for the mentally ill. Although we have no other comparable studies to compare our effect sizes, applying the general interpretation guidelines suggested by Cohen (1988) would lead us to consider most of the measured effect sizes as medium or medium to large in magnitude. Since most of the effect sizes were based on comparisons between two groups of unequal sizes, it is likely that they reflect attenuated estimates, that is they probably underestimate the true effect sizes (Kermery, Dunlap, & Griffeth, 1988). The effect sizes in the range of those reported for many MHC effectiveness indicators for these two MHCs are likely to have practical consequences for individual defendants, rather than reflecting group-level subtleties. For example, evidence for increased treatment referral and engagement was unequivocal. Some of the evidence was suggestive of an important prevention role, or at least negative predictive function, for participation in MHCs, in that individuals who chose not to participate fared worse after MHC referral, not only compared to those who did participate, but when compared to their own pre-referral history. In some cases, the indicators showing this pattern were not within the primary control of the court system, such as new charge severity (controlled mainly by the arresting officer), and clinician rated level of psychosocial functioning (i.e., global assessment of functioning (GAF) scores). However, some of the findings on criminal justice indicators—such as significant increases in jail days for post-referral bookings and increased total jail days served for opt-out defendants—could be interpreted as resulting from additional sanctions and recriminalization after referral to a MHC.

## 13. Recommendations

Both MHCs requested that the evaluators formulate recommendations for improvement based on the evaluation results. In each case, recommendations were made to the MHC, to its larger court structure, and to its governing body (city or county). Because many of the services on which these courts depend are managed at the state level, some recommendations also involved state agencies. Our research protocol allowed us to capture the many useful suggestions and observations of those we had interviewed and surveyed. Among the recommendations with potential applicability to other MHCs was our recommendation to the Seattle Municipal Court that some formal organizational identity be established for the SMMHC by explicitly adopting its model, and incorporating the SMMHC into assignment lists, budgets, and other routine aspects of court management. Other recommendations were aimed at either increasing or preserving the degree to which the MHC staff and courtroom were dedicated solely to the adjudication of MIMDs without competing responsibilities. Among recommendations of this type were to narrow mental health and public defender agencies to those who demonstrated a willingness and ability to work with MIMDs and within the MHC model. We also recommended that linkages between the jail psychiatric staff and jail health staff and the courts be strengthened and that the mission of jail psychiatric and health services be expanded to include participating in transition planning and treatment linkages for defendants under their care.

Because defendants present with a broad continuum of problems at various stages of progression or amelioration, we recommended the use of standardized clinical assessment instruments, such as the Brief Psychiatric Rating Scale (Lachar et al., 2001) in addition to diagnosis, for use by MHC clinicians, probation counselors and associated mental health provider programs. In addition to promoting more detailed understanding and awareness psychiatric status, standardization of assessment would assist in more objectively establishing the degree of current psychiatric impairment, assessing progress in treatment and changes in risk for reoffending related to psychiatric symptoms, and thereby, indirectly, evaluating the appropriateness of treatment received by MIMDs. Objective assessment would also assist in clarifying whether a defendant with a history of diagnosed mental disorder and substance use problems was more appropriate for participation in an MHC or in a drug court.

Although these MHCs were actively and successfully involved in linking clients to treatment and supporting the continuation of treatment engagement, especially medication compliance, little scrutiny was being made of the effectiveness of the treatments that clients were required to participate in. A series of brief trainings was recommended designed to familiarize court teams with on evidence-based medication and psychosocial interventions for mental illness and substance abuse and ways of working with treatment providers that might improve the effectiveness of the treatment offered through concentration attention on defendant progress.

Several recommendations addressed limitations in the MHCs as currently configured. For example, several informants felt that the MHC process should not be limited to misdemeanors

and that these courts should also adjudicate lower level felonys. The tendency for MHCs to be under-resourced relative to drug courts observed by Steadman et al. (2001) applied to these courts, which intermittently faced threats of reductions in staff members, dedicated staff time, and perhaps abolishment, due to budget cuts resulting from shrinking city and county tax revenues. It was recommended that a state and local task force on mentally ill offenders, similar to the one that had resulted in the founding of these courts, be convened to engage the organizations and agencies that have broad responsibility to shape and implement criminal justice policy in addressing the needs of MHCs.

## 14. Conclusions

The evaluations described in this report were limited in scope and purpose. As in the case of MHCs, relatively little in the way of resources were allocated to support the evaluation process. Each evaluation was designed and completed in less than 6 months, after the courts themselves had been in existence for only a short time. These restrictions precluded obtaining institutional review board approval to interview patients. Other data sources that were potentially available, such as records of hospitalization and substance abuse treatment, were not utilized. The quasi-experimental quantitative analyses were performed on relatively small samples. These limitations should tend to predispose the studies toward Type II errors, that is, to failing to find any existing differences related to MHC involvement. Nonetheless significant differences were found with substantial effect sizes. Although causality cannot be clearly attributed from studies of this type, we find it more reasonable than not to conclude that both MHCs described here made significant impacts on both the participants and nonparticipants referred to them. Both interviewees and quantitative data indicators point to a criminal justice system in that has been positively impacted by a new ecological presence, the MHC.

## Acknowledgements

This study could not have been completed without the openness and support of Judge Jim Cayce, formally of the King County District Court, and Judge Anne Levinson, formally of the Seattle Municipal Court.

Two co-investigators, David M. Wertheimer, of Kelly Point Partners, Seattle and Barbara Lucenko, Ph.D., of the Washington State Administrative Offices of the Court, Olympia made invaluable contributions to the Seattle Municipal MHC evaluation and the King County District MHC evaluations, respectively.

## References

Brickman, L. (2002). The death of treatment as usual: an excellent first step on a long road. Clinical Psychology: Science and Practice, 9(2), 195–199.

Casey, P., & Rottman, D. B. (2000). Therapeutic jurisprudence in the courts. Behavioral Sciences and the Law, 18, 445–457.

Goldkamp, J. S., & Irons-Guynn, C. (2000). Emerging judicial strategies for the mentally ill in the criminal caseload: mental health courts in Fort Lauderdale, Seattle, San Bernandino, and Anchorage. Washington, DC: Bureau of Justice Assistance.

Henggeler, S. W., Lee, T., & Burns, J. A. (2002). What happens after the innovation is identified? Clinical Psychology: Science and Practice, 9(2), 191–194.

Kermery, E. R., Dunlap, W. P., & Griffeth, R. W. (1988). Correction for variance restriction in point-biserial correlations. Journal of Applied Psychology, 73(4), 688–691.

Lachar, D., Bailley, S. E., Rhoades, H. M., Espadas, A., Aponte, M., Cowan, K. A., Gummatira, P., Kopecky, C. R., & Wassef, A. (2001). New subscales for an anchored version of the Brief Psychiatric Rating Scale: construction, reliability, and validity in acute psychiatric admissions. Psychological Assessment, 13(3), 384–395.

McGaha, A., Boothroyd, R. A., Polythress, N. G., Perila, J., & Ort, R. G. (2002). Lessons from the Broward County Mental Health Court Evaluation. Evaluation and Program Planning, 25, 125–135.

Poythress, N., Petrila, J., McGaha, A., & Boothroyd, R. (2002). Perceived coercion and procedural justice in the Broward Mental Health Court. International Journal of Law and Psychiatry (in press).

Slobogin, C., & Fondacaro, M. (2000). Rethinking deprivations of liberty: possible contributions from therapeutic and ecological jurisprudence. Behavioral Sciences and the Law, 18, 499–516.

Steadman, H. (1992). Boundary spanners: a key component for effective interactions of justice and mental health systems. Law and Human Behavior, 16, 75–87.

Steadman, H. J., Davidson, S., & Brown, C. (2001). Law and psychiatry: mental health courts: their promise and unanswered questions. Psychiatric Services, 52(4), 457–458.

Trupin, E., Richards, H. J., Lucenko, B., & Woods, P. (2000). Phase I process evaluation and preliminary outcomes data for the King County District Court Mental Health Court. Available from King County Metropolitan Government Website: http://www.metrokc.gov.

Trupin, E., Richards, H. J., & Wertheimer, D. M. (2001). Phase I process evaluation and preliminary outcomes data for the City of Seattle Municipal Court Mental Health Court. City of Seattle Website: http://www.cityofseattle.net.

Watson, A., Hanrahan, P., Luchins, D., & Lurigio, A. (2001). Mental health courts and the complex issue of mentally ill offenders. Psychiatric Services, 52, 477–481.

Wexler, D. B., Winick B. J. (Eds.) (1996). Law in a therapeutic key. Durham, NC: Carolina Academic.

Filename:            MHC Seattle & Flordia Comparison
Directory:           C:\Users\willf\Downloads
Template:

                     C:\Users\willf\AppData\Local\Packages\Microsoft.Office.Desktop_8wek
        yb3d8bbwe\LocalCache\Roaming\Microsoft\Templates\Normal.dotm
Title:               PII: S0160-2527(02)00202-9
Subject:
Author:
Keywords:
Comments:
Creation Date:       8/18/2019 10:56:00 AM
Change Number:       1
Last Saved On:       8/18/2019 10:56:00 AM
Last Saved By:
Total Editing Time:  0 Minutes
Last Printed On:     8/18/2019 10:58:00 AM
As of Last Complete Printing
    Number of Pages:   23
    Number of Words:   8,624 (approx.)
    Number of Characters:     49,160 (approx.)

Wilfred A. Page
509 Erbbe St. NE
Albuquerque, NM
87112

RECEIVED
STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

AUG 2 0 2019

XELL R. ELFERS
CLERK

Mitchell R. Elfers
Pete V. Domenici
U.S. COURT HOUSE
Albuquerque, NM
333 Lomas Blvd. NW
87102

Clerks office

RESTRICTED
DELIVERY

7019 0700 0000 5865 5863

CERTIFIED MAIL

1006

87102



U.S. POSTAGE P
PM 1-Day
ALBUQUERQUE,
87113
AUG 19 19
AMOUNT
$18.9
R2304E107356-8



ng Bubble Cushioned Mailer
ur auto-collant de bulle coussine
olchado autoadhesivo

15 in • 26.6 cm x 38.1 cm

# Wilfred Page

**#5**

if Wilfred Page Does not

Line up from Envelope to the

Sticky Flapp contents inside

have been tampered with.